IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1487
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CHARLES E. WEBSTER and BOBBY NELSON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

(May 5, 1992)

Before KING, JOHNSON and DAVIS, Circuit Judges.

PER CURIAM:

Charles Webster and Bobby Nelson were convicted of conspiracy to distribute and possess with intent to distribute controlled substances. Webster was also convicted of money laundering and using and carrying a firearm during and in relation to a drug offense. They appeal their convictions and their sentences, arguing that the district court made numerous errors throughout the trial and sentencing. We affirm their convictions, but vacate and remand their sentences to allow the district court to determine the amount of drugs each defendant knew or reasonably should have foreseen was involved in the conspiracy.

I.   BACKGROUND

Charles Webster and Bobby Nelson were tried together on a seven-count indictment.  Both were charged with conspiring to distribute, and possess with intent to distribute, controlled substances.  The remaining six counts were brought against Webster only.  Five counts charged him with instances of money laundering and one count charged him with using and carrying a firearm during and in relation to a drug trafficking offense.  The jury found the defendants guilty as charged after a six-day trial.

Webster owned a building in Amarillo which housed a restaurant known as the Cotton Club.  He leased the restaurant to Nelson, who operated it.  Both Webster and Nelson sold drugs (including cocaine, marijuana, Preludin and Dilaudid) from various locations, including inside and outside the building that housed the Cotton Club, as well as the adjacent building, their vehicles, their residences, and a car wash.

In October 1988 the county sheriff's department executed a search warrant for the building next to the Cotton Club and for Webster's vehicle.  Under a bench in front of the building, the search uncovered a plastic bag with two glass bottles containing Dilaudid and Preludin tablets.  The search of Webster's car revealed the following items: a .22 caliber pistol and a marijuana cigarette in the trunk, and a tupperware container in the front seat, which contained a billfold with Webster's driver's license and credit cards, a plastic drinking cup with

Webster's fingerprints, a ledger, a loaded .357 magnum, and a baggie containing 55.47 grams of cocaine. A December 1988 search of the Cotton Club turned up a freezer bag, containing marijuana and cocaine, and a number of small plastic baggies contained in a larger plastic bag. A search of Webster's residence resulted in the seizure of a glass crack pipe from under the seat of his Mercedes (where he had been seated), cocaine, $30,215 in cash, $44,000 in savings bonds, several firearms, a set of electric scales, and thousands of small zip-lock baggies. The district court denied Webster's motion to suppress the evidence resulting from the search of his residence.

Six days after the trial was over, the defendants moved for a new trial on the ground of juror incompetence and misconduct. Accompanying the motions for a new trial was an affidavit of an alternate juror who stated that one of the jurors suffered from a hearing impairment throughout most of the trial, and repeatedly asked other jurors to repeat what had been said. The court heard testimony from the alternate juror, as well as from additional witnesses, and ultimately denied the motion.

## II. DISCUSSION

### A. New Trial for Juror Misconduct/Incompetency

Webster and Nelson argue that the trial court should have conducted a fuller investigation into jury misconduct and incompetence, or should have granted them a new trial. The district court held two hearings on the defendants' motion for a new trial. At those hearings, the court heard testimony,

elicited by the defendants, from an alternate juror (Hathcock), and from a government agent with whom Hathcock had previously cooperated in an undercover capacity in a different matter. The government called the court security officer who served as bailiff during the trial (Glen Parrot), the district court clerk during the trial (Sharon Sauls), Hathcock's estranged wife (Patty Hathcock), and an acquaintance of the Hathcocks' (Celia Forbis) to testify at the second hearing on motion for new trial. Following those hearings, the court denied the defendants' motion for a new trial, finding that Hathcock's testimony was not credible.

Hathcock testified that one of the jurors (McGill) had trouble hearing during the trial. Parrot testified that, at one point during the trial, a number of the jurors expressed difficulty hearing Nelson's attorney, but that no individual juror indicated a particular problem hearing during the course of the trial. He testified that he later asked if anyone was having difficulty hearing, and the jurors indicated they were no longer having any trouble. The other witnesses testified regarding Hathcock's credibility and his acquaintance with one of the defense lawyers.

McGill evidently was suffering from an allergy which caused her sinuses to fill and her ears to block. The trouble first appeared during voir dire, when McGill informed the judge that she was having trouble hearing what was going on. At that point the court informed her that if she was selected as a juror she

4

would be seated in the jury box, closer to the proceedings. For the remainder of the voir dire, however, the judge invited McGill to move to a seat which would place her closer to the lawyers and the judge. After taking a closer seat, McGill was asked by the prosecutor whether she could hear adequately. McGill replied that she could, "sometimes." The judge informed McGill that if she had trouble hearing, she should inform the court, to which McGill replied: "My ears are really stopped." The judge responded, "All right," and the voir dire continued. Evidently, neither side attempted to exclude McGill from the jury for cause or otherwise. In fact, the issue of McGill's hearing did not arise again until after the trial and verdict, when the defendants submitted their motion for new trial.

The defendants argue that the district court did not adequately respond to their motion for new trial. They contend that the court should have engaged in further questioning, including interviews of the jurors, in order to ascertain McGill's ability to follow the proceedings and whether or not her actions (asking other jurors what had been said) constituted juror misconduct. They cite United States v. McKinney, 429 F.2d 1019 (5th Cir. 1970) (McKinney I), for the proposition that the court should have gone further than it did. The defendants contend that McKinney I imposes a strict procedure, which a judge must follow whenever a new trial motion alleges juror misconduct. The procedure would include a "full investigation" to determine whether the misconduct occurred, and if so, whether it was

5

prejudicial. In any event, the judge must set forth any findings with adequate specificity for meaningful appellate review. McKinney I, 429 F.2d at 1026.

This argument ignores the fact that we repudiated McKinney I on rehearing. United States v. McKinney, 434 F.2d 831, 833 (5th Cir. 1970), cert. denied, 401 U.S. 922 (1971) (McKinney II). In McKinney II, the court noted the inappropriateness of a strict procedure in cases such as this; instead, the court required fact-specific decision-making. "The trial court's duty in deciding a motion for new trial when jury misconduct is alleged must be judged on the peculiar facts and circumstances of each case. . . . And the trial court's decision will be reversed only upon a showing of an abuse of discretion." United States v. Sedigh, 658 F.2d 1010, 1014 (5th Cir. Unit A 1981), cert. denied, 455 U.S. 921 (1982) (citing McKinney II).

We review the district court's denial of the defendants' motion for a new trial for a clear abuse of discretion. Id.; United States v. Fowler, 735 F.2d 823, 830 (5th Cir. 1984). The trial court denied the defendants' motion in part on its finding that Hathcock was not a credible witness. The court cited inconsistency in Hathcock's testimony, as well as what the court found to be misrepresentations about a prior relationship between Hathcock and Webster's attorney. Overall, the court found that Hathcock's testimony failed to raise a colorable claim of incompetence regarding McGill.

6

The defendants spend much of their argument attempting to show that the district court's finding regarding Hathcock's credibility was wrong. Their efforts are misdirected. They do not show even that the finding was clearly erroneous, let alone an abuse of discretion. In fact, the testimony of every other witness at the post-trial hearings dealt with Hathcock's credibility. Determinations of credibility fall clearly within the peculiar competence of the district court. We certainly cannot say that such a determination constitutes an abuse of discretion.

Both parties argue heatedly over whether Hathcock should be considered a "non-juror" for the purposes of Fed. R. Evid. 606(b), which prohibits testimony by a juror "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that juror or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith." In Tanner v. United States, 483 U.S. 107, 117 (1987), the Supreme Court noted that exceptions to this rule were recognized only when extraneous influences were brought to bear on the jury.[1] This created a distinction between internal and external influences; juror testimony about internal

[1]In fact, Tanner did not reach the question of whether such exceptions actually exist. Instead, the Court merely assumed that the Rule left open the possibility that it had incorporated the common law exception. Since the exception was inapplicable in the Tanner case, the Court did not conclusively decide the question.

7

effects would be prohibited by the Rule, while testimony could be heard regarding external influences.

In Tanner, the Court noted that "[c]ourts wisely have treated allegations of a juror's inability to hear or comprehend at trial as an internal matter." Tanner, 483 U.S. at 118 (citing Government of Virgin Islands v. Nicholas, 759 F.2d 1073 (3d Cir. 1985); Davis v. United States, 47 F.2d 1071 (5th Cir. 1931)). We applied the Tanner rule in Weaver v. Puckett, 896 F.2d 126, 128 (5th Cir.), cert. denied, 111 S. Ct. 427 (1990). In Weaver we noted that, in order to initiate any post-verdict inquiry into an internal matter regarding a juror, an "'extremely strong showing' of juror incompetence" must be adduced, and "substantial evidence of incompetence must originate in a non-juror source . . . ." Id.

In this case, the district court noted the Weaver standard and found that the evidence presented by the defendants did not constitute the requisite "extremely strong showing" of juror incompetence. This finding is consistent with the court's credibility determination, noted earlier. We need not decide the question whether Hathcock should be considered a non-juror source for the purposes of Rule 606. The district court's decision noted, and we agree, that even if Hathcock were considered a non-juror, his testimony (especially in the light of the district court's credibility determination) did not meet the high standard required for the court to continue its investigation by questioning jurors.

B. Webster's Motion to Suppress

Webster filed a motion to suppress evidence resulting from a search of his residence based on a warrant dated July 11, 1990. He alleged that the information on which the search warrant was issued was stale, and that there was a lack of probable cause for the search warrant.[2] The warrant was issued based on a deputy sheriff's affidavit, which described a number of arrests, police surveillance, and informants' observations regarding Webster between 1984 and 1990.

Webster cites United States v. Freeman, 685 F.2d 942 (5th Cir. 1982), for the proposition that items such as drug caches and paraphernalia are more sensitive to staleness than items such as documentary records. Id. at 951. Webster alleges that the only statement in the affidavit concerning the location of controlled substances or paraphernalia at Webster's residence was an assertion that a confidential informant bought drugs from Webster at his residence on two unspecified dates in 1988. Even

_____

[2]Nelson joined in Webster's motion to suppress. Nelson concedes that he does not have Fourth Amendment standing to move for suppression of evidence based on a search warrant for Webster's residence. United States v. Tolliver, 780 F.2d 1177, 1184-85 (5th Cir. 1986), vacated on other grounds, 479 U.S. 1074 (1987). He argues, however, that his Fifth Amendment right to a fair trial was infringed by the introduction of improperly obtained evidence. United States v. Merkt, 764 F.2d 266 (5th Cir 1985). The government argues that Merkt stands only for the proposition that evidence may be excluded if it was obtained in violation of a non-defendant's Fifth Amendment right, and that it should not be extended to cover alleged violations of a co-defendant's Fourth Amendment rights. Since we agree with the district court that the search was conducted in good-faith reliance on the warrant, we do not reach the question of Nelson's standing.

9

assuming the dates were in late 1988, Webster argues, more than 18 months had passed before the search warrant was issued.[3]

We engage in a two-step review of the trial court's denial of Webster's motion to suppress. The first step requires us to decide whether the good-faith exception to the exclusionary rule applies. United States v. Craig, 861 F.2d 818, 820-21 (5th Cir. 1988); United States v. Leon, 468 U.S. 897 (1984). If the good-faith exception applies, we need not reach the question of probable cause. Craig, 861 F.2d at 820-21.

The magistrate relied on United States v. Mueller, 902 F.2d 336, 340 (5th Cir. 1990), for a statement of the four exceptions to the good-faith doctrine.[4] The magistrate found that none of these exceptions applied, and therefore that the good-faith doctrine rendered the officers' reliance on the warrant reasonable and justified. Of the four exceptions, Webster only contends that one (affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely

---

[3]In addition to the staleness claim, Webster argues that no probable cause existed for the issuance of a search warrant to seize records, documents, and correspondence relating to gambling paraphernalia. Since we find that the officers' good-faith reliance on the warrant was reasonable and justified, we do not reach the question of probable cause.

[4](1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

10

unreasonable) applies to this case.  He contends that the staleness of the information in the affidavit requires application of this exception to the good-faith rule.  Given the long-standing evidence of Webster's drug-trafficking activity, the government argues that the officers' reliance on the warrant was reasonable.  United States v. Webster, 734 F.2d 1048, 1056 (5th Cir.), cert. denied, 469 U.S. 1073 (1984).

Webster characterizes the affidavit too narrowly.  The affidavit alleged the existence, based on numerous sources of information, of a "long-standing, ongoing pattern of criminal activity . . . ."  Webster, 734 F.2d at 1056.  The affidavit included allegations of drug sales at the Cotton Club and adjacent buildings, as well as at Webster's residence.  These allegations included drug sales within one or two weeks prior to the warrant's issuance.  The fact that some of these sales took place at locations other than Webster's residence is not determinative.  The affidavit alleged that, based on the officer's experience, drug dealers and traffickers commonly keep caches of drugs, as well as paraphernalia and records of drug transactions, in their residences.  In other words, the basis for searching Webster's residence was his overall drug trafficking and sales activity, not just those sales that actually took place at his residence.

Similarly, although the transactions on which the money-laundering allegations were based were initiated more than a year prior to the warrant's issuance, the affidavit alleged that cash

11

payments had been made as recently as one month prior to the date of the warrant.  Based on the "laminated total" of available facts, Craig, 861 F.2d at 821, it seems clear that the officers' reliance on the warrant was reasonable, especially given the allegations of long-standing, ongoing criminal activity.  Cf. Webster, 734 F.2d at 1056.  Since the officers' good-faith reliance on the warrant was justified, we do not reach the issue of probable cause.  Craig, 861 F.2d at 821.

C.  Sufficiency of the Evidence

Webster and Nelson challenge the sufficiency of the evidence to convict them on the conspiracy count.  Webster further argues that the evidence was insufficient to convict him of the money laundering counts and the firearm count.

On a challenge of insufficient evidence, we review the evidence presented at trial in the light most favorable to the guilty verdict.  United States v. Nixon, 816 F.2d 1022, 1029 (5th Cir. 1987), cert. denied, 484 U.S. 1026 (1988).  The standard of review is whether any rational trier of fact could have found the essential elements beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1.  Conspiracy count

Both Webster and Nelson contend that the evidence was insufficient to support the jury's verdict on the conspiracy count with which both were charged.  Both defendants timely moved for acquittal at the close of the government's case and renewed their motions at the close of the evidence.  They argue that the

12

evidence presented at trial did not prove the elements of the charged conspiracy beyond a reasonable doubt.

The defendants concede that the evidence showed that both had possessed and sold drugs, and that each had referred clients to the other. They argue, however, that the government did not present evidence of an actual agreement or conspiracy between the two, and that the only evidence presented was of isolated drug transactions engaged in by one or the other defendant. They contend that the rental arrangement between Webster and Nelson was a legitimate business arrangement which explains their association and their proximity to one another at various times. They also argue that merely referring a willing buyer to a willing seller does not prove the existence of a conspiracy. See United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985).

The elements of the crime of conspiracy include (1) that a common agreement or conspiracy existed, (2) that the accused knew of the conspiracy, and (3) that the accused, with knowledge, voluntarily joined the conspiracy. United States v. Elam, 678 F.2d 1234, 1245 (5th Cir. 1982). It is not necessary that the members of a conspiracy work together on every transaction. Id. at 1247. The government need not prove the existence of the agreement by direct evidence; it may rely on circumstantial evidence. United States v. Bankston, 603 F.2d 528, 531 (5th Cir. 1979). The evidence, viewed in the light most favorable to the verdict, showed that the defendants sold drugs in each others' presence; that they consistently referred buyers to one another;

13

that they sold drugs stored in the same cache; that when one was selling from the cache, the other would come over to get drugs from the bag to sell; that if one needed to sell a drug that he did not have, he would obtain it from the other; and that one honored the other's volume discount. This evidence is clearly sufficient for a jury to infer the existence of a conspiracy between the defendants.

### 2. Money laundering counts

Webster also argues that the evidence was insufficient to convict him on the money laundering counts. He concedes that he made the cash purchases that represent the bases for the money laundering counts. He contends, however, that the jury's findings on the money laundering counts are unsupported because defense witnesses testified that they saw Webster gambling and winning "substantial sums of money in the thousands of dollars."

At trial the government presented evidence of drug sales and of Webster's legitimate cash income, which the government contended was insufficient to support the amount of cash payments he made. Evidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when the defendant claims income from additional sources. United States v. Jackson, 935 F.2d 832, 839-42 (7th Cir. 1991). The evidence in this case conforms to the Jackson standard.

Webster also argues that the district court improperly admitted opinion testimony by IRS agent Metzler, who testified that Webster's unexplained cash receipts were evidence of income

14

from narcotic sales and from illegal gambling. Webster contends that this amounted to testimony on an ultimate issue to be decided by the trier of fact, in violation of Fed. R. Evid. 704.

Rule 704(a) states that "testimony in the form of an opinion or inference otherwise admissible is <u>not objectionable</u> because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a) (emphasis added). The only exception to Rule 704's allowance of expert testimony on ultimate issues is:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.

Fed. R. Evid. 704(b). Since Metzler did not testify as to Webster's mental state or condition, his testimony was admissible under Rule 704. Webster's argument to the contrary is no more than an exhortation to disregard the clear language of the Rule.

### 3. Firearm Count

Webster concedes that a Ruger .357 magnum revolver was seized from a 1979 Cadillac in which he was sitting during an October 1988 search. The gun was found in a tupperware box that also contained 55.47 grams of cocaine. Webster argues that the record does not reflect any evidence as to the amount of cocaine consistent with personal use, and that therefore the government did not prove that the firearm had been used or carried during and in relation to a drug trafficking offense. Contrary to Webster's assertion, however, DEA special agent Watson testified that possession of 24 grams of cocaine was inconsistent with

15

personal use.  The record supports Webster's conviction on the firearm count.

D.  Sentencing Guidelines Issues

Webster and Nelson both argue that the district court erred in overruling their objections to their presentence reports (PSRs).  They objected to the PSRs' findings attributing over two kilograms of cocaine to them during the course of the conspiracy.  Nelson also challenges the district court's enhancement of his sentencing level for possession of a firearm during the commission of the offense.

We review factual findings under the sentencing guidelines for clear error.  United States v. Buenrostro, 868 F.2d 135, 137 (5th Cir. 1989), cert. denied, 495 U.S. 923 (1990).  We must uphold a sentence imposed under the guidelines unless it was imposed in violation of law, or was imposed as a result of an incorrect application of the sentencing guidelines, or was outside the range of the applicable guideline and is unreasonable.  Id. at 136.

1.  Attribution of drug quantity

Webster and Nelson argue that the district court erred in overruling their objections to the PSRs, which attributed more than two kilograms of cocaine to them during the conspiracy.  They contend that the district court failed to make a specific finding that each defendant knew or reasonably should have foreseen the involvement of any particular quantity of drugs.

16

The district court must make a specific finding of the amount that each conspirator knew or should have known or foreseen was involved in the conspiracy.  United States v. Puma, 937 F.2d 151, 159-60 (5th Cir. 1991), cert. denied, 112 S. Ct. 1165 (1992).  Puma held that a conviction for conspiracy does not automatically mean that every conspirator could have foreseen the total quantity of drugs involved in the entire conspiracy.

The record in this case does not include the defendants' objections to the PSRs, but the transcript of the sentencing hearing does record the exchanges between the judge and defense lawyers regarding the written objections to the PSRs.  Both defendants objected to the PSRs' attribution of more than two kilograms of cocaine to each defendant.

Nelson's PSR states that "the evidence presented during the trial, along with the physical evidence seized by federal authorities, supports a conservative total figure of more then two kilos of cocaine, or its equivalent, dispersed by the defendants during the course of the conspiracy."  This language indicates that the PSR took into account the drug sales of both defendants without determining the amount either one of them knew or reasonably should have foreseen.  Webster's PSR states only that "[t]he offense of conviction involves at least two kilograms of cocaine, or its equivalent, according to the Government."  The "offense of conviction" was conspiracy.  Neither PSR states that either defendant knew or reasonably should have foreseen the amount of drugs involved in the entire conspiracy.

17

At the sentencing hearing, the judge overruled Webster's objection, stating "the finding [in the PSR] is supported by the evidence, and the Court makes the same finding." She also overruled Nelson's objection, stating, "I will find that that is an accurate estimate of the drugs involved." Neither response addressed the question whether each defendant knew or reasonably should have foreseen the amount of drugs involved in the entire conspiracy.

Rule 32(c)(3)(D) requires that the sentencing court make a finding resolving each controverted matter in the PSR. Fed. R. Crim. P. 32(c)(3)(D). While it is true that the sentencing court may satisfy this requirement by rejecting a defendant's objection and orally adopting the PSR's finding, see Puma, 937 F.2d at 155, here neither the district court nor the PSR specifically addressed the particular question at issue.

The government argues that Webster and Nelson were involved in a close-knit conspiracy and that each should have known the amount of drugs attributable to the conspiracy. The government also seeks to distinguish Puma from this case on its facts. In Puma, the defendant was involved in the conspiracy at a much lower level than the leaders of the conspiracy. Puma, 937 F.2d at 154. The government contends that the evidence here points to a close conspiracy in which Webster and Nelson shared a drug cache. Given the nature of the conspiracy, it argues, there was no need for separate findings for each defendant.

18

While the government's arguments are plausible, we emphasize that the district court did not address this problem below. We decline to consider this factual issue for the first time on appeal. Instead, we vacate the sentences and remand to the district court for a determination of the amount of drugs properly attributable to each defendant under the guidelines. Of course, we express no opinion on the outcome of this issue.

2. Weapon enhancement

Nelson argues that the district court improperly enhanced his sentencing level by two points for possession of a firearm during the commission of the offense. See U.S.S.G. § 2D1.1(b)(1). Nelson objected to the increase in the PSI, and submitted evidence at the sentencing hearing. The district court overruled Nelson's objection and found "it is clear that there was a connection between [the firearm] and the drug transaction . . . ." Nelson contends that there was no evidence showing that the firearm was possessed during the conspiracy.

The .22 caliber firearm was found during a search of the Cotton Club in December 1988. Nelson offered testimony at the sentencing hearing that the firearm was located on a shelf behind a stack of dinner plates in the kitchen area, and that, in order to retrieve it, one would have to reach behind the stacked plates and possibly knock them over. The testimony also indicated that Nelson was holding the weapon as collateral on a loan of money Nelson made to the owner of a firearm.

We review the district court's factfinding, connecting the weapon to a drug-related offense, only for clear error.  18 U.S.C. § 3742(e).  Once it is established that a firearm was present during the offense, the district court should apply the enhancement <u>unless</u> it is clearly improbable that the weapon was connected with the offense.  U.S.S.G. § 2D1.1, comment. (n.3). Possession need only be established by a preponderance of the evidence.  <u>United States v. Casto</u>, 889 F.2d 562, 570 (5th Cir. 1989).  Given these standards, we cannot say that the district court's finding was clearly erroneous.

### III.  CONCLUSION

The district court's denial of a new trial was not an abuse of discretion, since there was not an "extremely strong showing" of juror incompetence.  The district court's denial of Webster's motion to suppress was correct.  The evidence was sufficient to support the jury's verdict on all counts.  We therefore AFFIRM the convictions of both defendants.  Since the district court did not consider the question whether each defendant should be held to have known or reasonably to have foreseen that the conspiracy involved more than two kilograms of cocaine, we VACATE the sentences of both defendants and REMAND for further proceedings.

Convictions AFFIRMED; sentences VACATED and REMANDED.