UNITED STATES of America, Plaintiff–Appellee,

v.

Frank SIZEMORE and Elzie Sizemore, Defendants–Appellants.

No. 79–5104–5.

United States Court of Appeals, Sixth Circuit.

Argued June 19, 1980.

Decided October 9, 1980.

Richard Plymale, Deputy Federal Defender, R. M. Murphy, Asst. Federal Defender, Lexington, Ky., for Elzie Sizemore.

Ernie Lee Woods, Somerset, Ky. (Court Appointed), for Frank Sizemore.

Patrick H. Molloy, U. S. Atty., Robert F. Trevey, Asst. U. S. Atty., Lexington, Ky., for the U. S.

Before KENNEDY and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

On September 20, 1978 about 10:00 p. m., a car belonging to Greene Lunsford which he had parked in front of his house in Reed's Branch, Clay County, Kentucky was destroyed by an explosion. Defendants Elzie Sizemore and Frank Sizemore were convicted by a jury of making the destructive device which caused the explosion without

paying the required tax and possessing an unregistered destructive device in violation of 26 U.S.C. §§ 5861(d), 5861(f), 5871. They appeal on the grounds that the evidence is insufficient to permit the jury to find that they made or possessed the device. There was no dispute that a destructive device was involved or that it was not registered and no tax was paid.

The evidence is circumstantial. Involved is a family feud which requires that the relationship between parties and witnesses be set out. Frank Sizemore is Elzie Sizemore's nephew. Carl and Doug Sizemore are Elzie's sons. Elzie's ex–wife is Imogene Murrell. Two of Elzie's children live with Imogene. Imogene's father is Owen Byrd. Mr. and Mrs. Troy Melton are Elzie's in–laws.

Owen's brother is Charlie Byrd, the constable. Charlie's daughter is Rosetta Lunsford, whose husband is Greene Lunsford. Charlie Lunsford is their son. (Thus, Imogene and Rosetta are cousins.) Charlie Byrd's son is Ronnie Byrd. (In order to distinguish between the members of the Sizemore family, given names will be used in this opinion.)

The Murrells live about 100 feet up the hill from the Lunsfords in Reed's Branch, Clay County, Kentucky. Owen Byrd owns the field across the road from the two houses where he keeps ponies and cows and where the Murrell children sometimes play.

On appeal, the reviewing court must view all the evidence in the light most favorable to the government; if the verdict is supported by substantial evidence, it must be sustained. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Daniels*, 527 F.2d 1147, 1149 (6th Cir. 1975).

There was no dispute that there was "bad blood" between the Murrells and the Lunsfords. The Murrells had lived there about three or four months and the Lunsfords about a month when the explosion occurred. Each family accused the other of throwing rocks and gravel. The Murrells accused the Lunsfords, particularly Charlie Lunsford

and Ronnie Byrd, of pulling guns on the Murrell children. One of the Lunsfords called the law enforcement officers a short time prior to the explosion, complaining about their drinking, carrying on, and saying nasty things to Greene's daughter. Indeed, the families are still feuding—at the time of trial, grandmother Lunsford swore out a peace bond against the Murrells for threatening Charlie Lunsford with a gun.

About two weeks prior to the explosion, Elzie said he heard that the Lunsfords had pulled guns on his children who lived with the Murrells. Carl said that when his father heard about the gun incidents, his father got mad. Elzie went to the Murrells to take his kids home. He took Frank with him. He said he did not know of any trouble between Frank and the Lunsfords, but wanted him along in case there was trouble. Both Elzie and Frank had shotguns. They walked down the hill past Lunsfords. Greene Lunsford and Elzie had a talk. Greene was not armed. Elzie told Greene he did not want anyone messing with his children. Greene said he did not want anyone messing with his. Greene denied that any Lunsford had pulled a gun on Elzie's children. Both Greene and Elzie testified that they parted without any obvious animosity and that they had not had any trouble between them before. Mrs. Lunsford said that she heard Elzie say he would kill anyone who threatened his children.

The day of the explosion, September 20, 1978, Mrs. Lunsford said she saw Frank, Carl, and Doug at the Murrells around four or five o'clock. Frank had a knife holster on his belt. She said she heard from Wayne Sester that the Murrells told him that Frank and Elzie were planning some kind of trouble that night. She said her little girls overheard them talking about meeting Charlie Lunsford when he got off work. The Lunsfords went to get Charlie, but did not see Frank. Wayne made a statement to the police that he heard Frank and Elzie were going to make trouble, but later denied saying that. None of the direct recipients of these statements testified that these statements were made.

That evening, Charlie Byrd, the constable, received a phone call about three or four minutes after the explosion occurred around 10:00 p. m. informing him that Greene Lunsford's car had been blown up. The special agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF) arrived around midnight. Agents Combs and Howard investigated the scene. Agent Turk took samples from the car for testing for explosive compounds. The car was about 50 feet from the house. Pieces had been scattered several hundred feet. Lead wires led about 50 feet into the field. A defined path ran parallel to the car along the mountainside in the field. Leading down from the path was an undefined path with freshly broken briars and weeds. On this path, about 172 feet from the car, was found a hunting knife and holster. This knife was tested for fingerprints. The agents went to several people to ask questions. They questioned Frank about 3:00 or 3:30 a. m. and he voluntarily submitted to a test for residue of explosive compound. Agent Turk swabbed each of his hands three times, plus a test swab. The agents testified that Frank was read his rights and signed a waiver. Frank gave a statement stating that he had never handled dynamite, did not own a hunting knife, and was with his father all day and not with Elzie. Marie Sizemore, Frank's mother, testified he was not at home that evening.

The agents proceeded to Elzie's house where they read him his rights, took a statement, and swabbed him. Agent Turk was running out of solution so he only swabbed Elzie once on each hand plus a test swab. Elzie stated that he had never handled dynamite nor had he handled a hunting knife. He stated Frank, Carl, and Doug came to his house around 5:00 p. m.; they then went to Troy Melton's house where they drank and watched TV until 11:00 p. m., except for a brief jaunt by Elzie, Frank, and Troy to Elzie's home to feed the chickens.

The agents noticed that Frank had scratches on his arms and dried blood

around a cut by his left eye. Elzie had fine, bloody scratches on his ankles typical of those made by briars. No burrs were found in their clothing. Agent Howard concluded whoever made the path through the briars set the bomb off as he did not think the path could reasonably have been made by any of the livestock.

The knife and holster, the fingerprint lifted from the knife, the swabs from Elzie and Frank, and the pieces from the car were all sent to ATF for analysis. The lead wires in the present case had been extended by the use of lead wires from other blasting caps, an operation which requires the wires to be cut from the unused blasting cap and the insulation covering the copper wires to be scraped off in order to attach the wires to the wires connected to the functioning blasting cap. Such cutting may be done with a knife. Although no traces of copper were found on the knife, using a knife to just cut wire would not usually leave much copper on the knife. Wiping the knife, the special agents testified, would wipe away any copper residue. Dusting the knife and handling it for lifting fingerprints would further reduce the chance of finding anything on the knife. No scientific evidence established that the knife was used to make an explosive weapon. However, the knife was found on the freshly made path and the fingerprint on the knife was identified to be Elzie's. No prints of Frank's were found on the knife.

The dashboard of the car revealed traces of nitroglycerin, an explosive compound and one used in commercial dynamite. The swabs of Frank were negative for nitroglycerin or any other explosive compound. One of the swabs from Elzie was negative, one was positive for nitroglycerin; combined, they were positive. The chemist concluded Elzie had handled something containing nitroglycerin.

Floyd Woods testified that he worked with Elzie for R & R Coal Company and that about one month before the explosion, he saw Elzie take some dynamite they were supposed to be loading and put it in a culvert, saying that he wanted to blow some

fishponds with it. He did not know if Elzie later picked up the dynamite from the hiding place, but testified Elzie had said he would come get it around quitting time.

Freddy Johnson and his son testified that on the day of the explosion, about 1:00 p. m., Frank came into Freddy's shop to buy a hunting knife. Freddy sold him one identical to the one found in the field by the car. As he was leaving after the sale, Freddy and his son testified, Frank said there was someone or some SOB he would like to skin. Johnson said that maybe one other store stocks that brand of hunting knife. He stocks three or four at a time. He has sold maybe two dozen of them but none to anyone who lives in Reed's Branch except to Frank. About a week after the explosion, Freddy said Frank came into the store and told Freddy not to say Frank bought the knife if anyone asked. Freddy said he replied that he would not perjure himself for anybody.

Frank and Elzie testified in direct contradiction to most of the evidence presented by the government. Frank admitted he bought a knife similar to the one found on the path but he did not think that was his holster as it was cut and dirty while his was new. (Agent Turk said he cut the holster trying to test for explosive residue.) He said he and his brother Doug went to buy the knife around 9:30 or 10:00 a. m. He denied making the comment about skinning someone and said he bought the knife for coon–skinning. His mother agreed he hunts coons. He denied telling Freddy a week later not to say he bought the knife. He said he told Freddy only that he lost it. After buying the knife, he and Doug went back to Frank's house. Elzie then joined them to exchange some car seats. While at Frank's, Frank and Elzie took turns throwing the knife into the ground. That afternoon, Frank took Doug to the Murrells around three. He took off the holster and showed the knife to everybody but left without it. He went to his father's for awhile, then to Elzie's. Then Elzie, Doug, Carl, and Frank left for the Meltons around six. At the Meltons, they drank beer and

watched TV until 11:00 p. m. except for a brief trip by Elzie, Frank, and Troy back to Elzie's to feed the chickens. Frank did not go inside the Meltons, he said, because Mrs. Melton does not like him as she thinks that he swore out a false affidavit against her when he was a deputy sheriff.

Frank admitted he made false statements about not being with Elzie and not having a hunting knife. He said he was scared because they woke him up about 3:00 in the morning and said they had found a knife. He said he was told a body had been found in Reed's Branch and he was afraid one of the Murrell children had had the knife. The special agents denied saying they had found a body in Reed's Branch.

Elzie said he went to Frank's; Frank and Doug arrived later. He threw the knife a couple of times that morning after Frank showed him the new knife. Then he said he went back home to put the seats in the car. Early in the evening, Frank, Doug, and Carl came by and they all went to the Meltons. He said Frank never went inside the Meltons because Mrs. Melton did not like Frank. Elzie went in and out, watched TV some. Elzie was watching TV when they heard the explosion. Frank said he was on the porch and he did not hear the explosion—he paid no attention to it.

Doug agreed that the knife was purchased in the morning and that Frank did not make a comment about skinning someone. But he said when they went to Frank's house, Elzie arrived later.

Troy Melton agreed that both Frank and Elzie were at his place during the evening except when they were feeding the chickens. His daughter testified at trial that after the explosion she came out and saw Frank, Elzie, and her mother, among others, watching TV. But she had earlier made a statement that she knew Elzie and Frank had left but was not sure whether it was before the explosion or after. Mrs. Melton testified that she was told Frank was there but she never saw him.

Elzie testified that he did not work for R & R Coal Co. with Floyd Woods about a month before the explosion. Instead, he had last worked for the coal company the preceding May. He admitted he put aside several sticks of dynamite, but said his supervisor, whose name he could not immediately recall except for a nickname, told him he could take it. He said he wanted to blow some fish out a pond (cheap way of fishing), but that he forgot about it and never went back for the dynamite. He denied ever making a statement that he had never handled dynamite; rather, he had said he had not handled dynamite for thirty days prior to the explosion, which was true. He admitted lying about the knife; he lied because he knew Frank had a knife and did not want to get Frank in trouble. During late August and September 1978, he worked for a drilling contractor. He knew he worked the day before and the day after the explosion and he thinks he might have worked on the 20th.

The drilling contractor testified that Elzie worked at a gas well site where previously, August 26, 1978, 80 quarts of nitroglycerin had been exploded in a well to clean it out. Elzie did not handle the explosive—the blast occurred before he began working—but he handled the debris. Water was pumped into the well to clean out the fractured rock. Elzie worked to break up the large rocks and ground them into the water so the water can be extracted with a bailing device. The drilling contractor testified that they used a jell form of nitroglycerin, which is encased in sawdust and wrappers which are saturated with nitroglycerin. After the blast, he often finds pieces of the wrapper that have not been consumed. Elzie worked with greasy tools and several times a day (50 or 60) handled cables which went into the area where the nitroglycerin had been exploded, although he most likely wore gloves.

Dr. Tolbert, assistant professor of organic chemistry at University of Kentucky, testified for the defense. In his opinion, nitroglycerin debris would remain on the ground after a blast for several weeks and a person working with this could pick up traces on his hands. Nitroglycerin is an oily substance and is attracted to oily substances,

which is why it stays on the hands. However, wearing gloves might hamper the opportunity for contact with nitroglycerin depending on how porous the gloves were. Further, weather and rain would decrease the amount of nitroglycerin remaining in the soil. The professor further admitted that washing one's hands, putting them in pockets, etc., would also decrease the likelihood of sufficient nitroglycerin remaining to give a positive test. And if the person touched dynamite four hours before the test, that would more likely result in a positive finding than if the person had handled tools the day before where a nitroglycerin blast had previously occurred.

The government expert, John McCown, although he had no personal experience with nitroglycerin blasts, checked with government experts who said that with that size of a blast, just about all the nitroglycerin would be consumed and the amount remaining would be so negligible that a positive test result would be very unlikely. There was no objection to this testimony.

■ This Court concludes that substantial evidence supported the jury verdict against Elzie Sizemore. From the evidence presented, the jury could reasonably conclude Elzie both possessed and made a dynamite bomb. From the evidence, the jury could reasonably find the following: Elzie had motive—he thought Lunsfords were threatening his kids; he had access—he was seen putting aside dynamite; he had handled the bomb—the traces of nitroglycerin on his hands reasonably show he held the dynamite; he had participation—wires led to the briar patch, he had scratches made by briars, his fingerprint was on a knife found on this path made by humans and not livestock, something like a knife had to be used to make the bomb operable. He provided competing evidence to explain his whereabouts, the presence of the nitroglycerin, and the presence of both the knife and his fingerprint on it, but the evidence was impeached in every respect. His alibi witnesses are relatives (further, one agent said that Troy told him that he, Troy, was afraid of Elzie because Elzie nearly beat him to death; Troy denied making the statement) whose stories were not entirely consistent. Any nitroglycerin remaining from the blast at his place of employment would have been affected by the weather and rain, said the defendant's expert; indeed, this well was being washed out with *water*. Children might have been playing with the knife in the field, but Frank admitted it was an expensive knife which he just happened to leave it at the Murrells. He claimed to have shown it to Elzie in the morning yet the storekeeper testified the knife had not yet been sold to Frank at that time and Mrs. Lunsford saw a knife holster on his belt around four or five o'clock. Further, Frank and Elzie had the briar scratches and none of the children said they were playing with the knife in the field. Choosing which witnesses to believe as being more credible is an issue for the jury. *See Glasser, supra,* 315 U.S. at 77–80, 62 S.Ct. at 468–469.

■ However, this Court concludes that the jury verdict against Frank Sizemore.is not supported by substantial evidence. There is evidence that he bought the knife, but no evidence he used the knife at or about the scene of the explosion as his prints were not found on the knife. Elzie's prints on the knife are evidence that it was he who had it in the field. There is evidence Frank was at the scene as he had the briar–type scratches on him, but no evidence indicates he had any control over the explosive device or over any of the component parts as no nitroglycerin showed up on his hands. He admittedly made false statements, but he could have been simply protecting his uncle or trying to avoid guilt by association. There is nothing about these crimes which requires the efforts of more than one person.

Mere presence without more does not prove possession. *See United States v. Romano,* 382 U.S. 136, 141, 86 S.Ct. 279, 282, 15 L.Ed.2d 210 (1965); *United States v. Birmley,* 529 F.2d 103, 107 (6th Cir. 1976). Nor does it prove aiding and abetting. *See United States v. Johnson,* 513 F.2d 819, 823–24 (2nd Cir. 1975). That Frank lied

**14**

when questioned by ATF agents is relevant, but it does not by itself prove he took part in the venture. *See Johnson, supra*, 513 F.2d at 824.

This Court affirms the conviction of defendant Elzie Sizemore and reverses the conviction of defendant Frank Sizemore.