UNITED STATES of America, Plaintiff–Appellee,

v.

Bobby C. McDOUGALD, Defendant–Appellant.

No. 92–3058.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1992.

Decided April 6, 1993.

Order Denying Rehearing and Supplemental Opinion filed June 16, 1993.

Bradley D. Barbin (argued and briefed), Columbus, OH, for plaintiff-appellee.

Benson A. Wolman (argued and briefed), Moots, Cope & Stanton, Columbus, OH, for defendant-appellant.

Before: MERRITT, Chief Judge; and MARTIN and BOGGS, Circuit Judges.

MERRITT, Chief Judge.

Defendant Bobby McDougald appeals his jury conviction for money laundering in

violation of 18 U.S.C. § 1956. He was sentenced to eight years in the federal penitentiary. He is accused of buying a car for a drug dealer knowingly using $10,000 in drug proceeds, and registering the car in his own name. He asserts that the evidence produced at trial was insufficient to establish that the money was drug proceeds or that he knew the money was drug proceeds. The case is based on weak circumstantial evidence that the money in question was drug money and even weaker evidence that the defendant knew it was drug money. On the basis of the facts before us, we believe it is not possible for a rational mind to conclude with confidence, or "beyond a reasonable doubt," that Bobby McDougald violated 18 U.S.C. § 1956.

### FACTS

Taking the view of the evidence most favorable to the government, the facts are as follows:

Bobby McDougald, a former Green Beret thrice-wounded in Vietnam, is a fifty-four year old retired army sergeant living in Columbus, Ohio. Ronald and Darlene Watts also live in Columbus. They were the key witnesses against Bobby McDougald at the trial. They had been close family friends of McDougald, and referred to him as "Uncle Bobby." Before Ronald Watts' arrest for conspiracy to distribute cocaine, he was involved in a drug ring centered in California. He also ran "Wattsline Entertainment," a successful promotion company. There is no evidence that McDougald knew the Wattses dealt in drugs.

In June of 1990, Ronald Watts asked Bobby McDougald to take a Wattsline Entertainment van to California to pick up his "friend" Eddie McFadden. McDougald agreed, saying that he wanted to visit his granddaughter in California. McDougald was given no address or phone number for McFadden. He was told to meet him at a McDonald's restaurant at a certain time. This meeting did not come off as planned, and McDougald telephoned Watts for instructions. A meeting was arranged and McDougald drove McFadden and Billy, an associate of McFadden's, back to Columbus.

Eddie McFadden was a major drug dealer in California and a federal fugitive. He was the center of the California drug ring, which included Ronald Watts, Jack Burton, Billy, and Novell. Bobby McDougald was not part of this drug ring, and there is no evidence that he knew of its existence. The only evidence that McDougald knew that any of these people were involved with drugs was testimony that Ronald Watts had once lit a marijuana cigarette in McDougald's car. McDougald immediately pulled over and insisted that Watts put the cigarette out and never have drugs in his presence again. Ronald and Darlene Watts both testified that McDougald was opposed to drugs and would not involve himself in a drug transaction.

On June 3, Jack Burton went to Bill Swad Cheverolet in Columbus to look at cars. A purchase order was made out that day in the name of "Ed Burton" with a false address. The government concludes that this name was a combination of the names of Eddie McFadden and Jack Burton. The purchase order was eventually cancelled.

The next day, June 4, McFadden, Burton, Billy, and Novell met at Watts' house and looked over auto magazines. Watts called McDougald and asked him to come over and buy a car for McFadden. McDougald came, stayed about fifteen minutes at Watts' house, and left with Watts and Burton. McFadden gave Burton $10,000 in cash with which to buy the car.

The three men went to the Chevrolet dealership and picked out a 1990 Beretta, the same car for which the purchase order had been filled out the day before. McDougald informed the dealer that he would be paying in cash, and the men went into the dealer's office. Once in the office, Burton passed the cash to McDougald behind the table. McDougald bought the car and registered it in his own name. The selling price was $9999 plus $3.50 for temporary tags. The three men then returned to Watts' house. About two days later, McDougald drove McFadden back to California in the new Beretta. He left the car with McFadden and flew back to Columbus.

In the fall of 1990, McDougald began to receive by mail California parking tickets on the Beretta. He complained to both Darlene and Ronald Watts that he could not afford to pay these tickets, and was unable to contact McFadden. Ronald Watts eventually agreed to pay the tickets. The day before his trial, McDougald also received notice from California that the Beretta was being impounded.

On January 18, 1991, Columbus police searched Ronald Watts' home. During this search McDougald entered the house, dropped off some soap and other innocuous items, and left without being questioned by police. The police discovered a set of keys to a 1990 Beretta and a temporary tag registration in McDougald's name.

On February 9, 1991, McDougald was questioned by police. The officers asked McDougald what cars he owned, and he answered that he owned a 1980 Olds, a 1975 Buick, and a 1978 Eldorado. When the officers asked him if he owned any other cars, he answered that he had at one time owned a 1972 Cadillac and a 1990 Beretta. He told them that he could not remember what the Beretta had cost or whether he had bought it with cash or on credit. He said that the Beretta had been totalled in an accident in October or November of 1990. The police found no record of the Beretta having been involved in an accident, but did discover that McDougald's 1978 Olds was involved in a minor accident in September of 1990.

At trial, McDougald presented an entirely different version of the whole affair. He testified that he borrowed Watts' van to travel to California to visit friends and family. He said that he did not meet McFadden, and returned home alone. He also denied buying the car for McFadden. He testified that he bought the car with his own money, drove it for awhile during the summer, and then lent it to his son. His son was stationed at Fort Stewart, Georgia. McDougald testified that his son called him from the base and told him that the Beretta had been involved in an accident. His son was then sent to the Middle East as part of Desert Shield and was unavailable for trial. We must presume that this entire story was fabricated.

### Sufficiency of the Evidence

To uphold this verdict we must find that the record contains sufficient evidence to convince a reasonable juror beyond a reasonable doubt that Bobby McDougald knowingly laundered drug money when he purchased the Beretta for Eddie McFadden. *See United States v. Connery*, 867 F.2d 929, 930 (6th Cir.1989). This court must review the evidence taking the view most favorable to the government. *United States v. Scartz*, 838 F.2d 876, 878 (6th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). We find that this record contains insufficient evidence that the money used to buy the Beretta was drug money or that Bobby McDougald knew it was drug money.

1. Source of the $10,000

There is no testimony or documentary evidence that the $10,000 was drug money. There are only two bases for a conclusion that it was. First, the money came from Eddie McFadden and Eddie McFadden is a drug dealer. Second, the purchase of the car was structured to conceal the identity of the true owner of the car. Courts differ over whether proof that a drug dealer has insufficient legitimate income to account for large purchases or large amounts of cash is sufficient evidence to support a conclusion that the money is drug profits. *Compare United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990) (holding that the government cannot rely exclusively on proof that the accused had no legitimate source of income) *with United States v. Webster*, 960 F.2d 1301, 1308 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992) (holding that evidence of a differential between legitimate income and cash outflow is sufficient to support a money-laundering conviction).

The government produced a good deal of evidence concerning Bobby McDougald's sources of income, but none at all concerning Eddie McFadden's. That McFadden dealt drugs is not sufficient proof that his every penny derived from drug sales. Ronald Watts provides a ready example of a person involved in drug trafficking who also has legitimate sources of income. The fact that McFadden himself dealt in drugs is insufficient to allow a rational jury to

find "beyond a reasonable doubt" that all of his money is drug money or that this money is drug money. He might also be an entertainer in Watts' stable of entertainers, many of whom may use cash.

The suspicious nature of the automobile purchase is also insufficient to support an inference that the $10,000 was drug money. The evidence suggests that McFadden either did not want the $10,000 to be attributable to him, or that he did not want the title and tags of the Beretta to be in his name. Laundering of drug profits is not the only plausible explanation for concealing assets. Legitimate income is often hidden from creditors and tax agents. An even stronger motive for McFadden to have the car put in McDougald's name was to obstruct any police investigation of his activities by obscuring the connection between the car and himself. The desire to misrepresent the true owner of an automobile provides little evidence of the source of the money used to purchase that automobile. Many people are driving cars titled in someone else's name. That McFadden used cash says little about whether it was drug money. Some relied heavily on cash long before drugs became a problem for our society.

### 2. Knowledge that the $10,000 was drug money

Even if there were sufficient proof that the $10,000 was drug money, there is insufficient evidence that McDougald knew its source. In fact, Ronald Watts, the government's primary witness, testified that he was unsure whether McDougald knew the money was drug money or not. The proof relied upon by the government that McDougald knew the $10,000 was drug money is (1) McFadden and Watts were drug dealers; (2) McDougald spent time with McFadden and Watts, and was especially close to Watts; (3) McDougald acquiesced in the suspicious acquisition of the Beretta; and (4) McDougald lied about what happened to the police and at trial.

That McFadden and Watts were drug dealers is relevant only if the government can show that McDougald was aware of this fact. The government relies in part upon proof that McDougald spent time in the car with McFadden and Billy, and was a close family friend of Watts. It has been noted that generally a criminal is inclined to hide his criminal activities even from family and friends. *United States v. Cunningham,* 804 F.2d 58, 61 (6th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1972, 95 L.Ed.2d 813 (1987). Although circumstantial evidence may be used to show knowledge, *United States v. Scruggs,* 549 F.2d 1097, 1104 (6th Cir.), *cert. denied,* 434 U.S. 824, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977), this rule does not condone guilt by association. *See, e.g., United States v. Nusraty,* 867 F.2d 759, 764 (2d Cir.1989) ("mere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement").

At oral argument, the government also argued that the circumstances surrounding McDougald's trip to California indicate that he knew McFadden was a drug dealer. McDougald traveled halfway across the country primarily for the purpose of picking up McFadden and driving him to Columbus. He was not, however, given McFadden's address or telephone number, but was instead told to meet McFadden at a McDonald's restaurant. Although this arrangement was unusual, it hardly indicates that McDougald knew McFadden was a drug dealer.

The suspicious nature of the car purchase also provides little evidence of knowledge. At the time of the purchase, McDougald knew that McFadden was paying in cash and that he wanted the car in McDougald's name. These circumstances indicated that McFadden was trying to hide his assets. Without knowing that McFadden was a drug dealer, McDougald was more likely to assume that McFadden was hiding his assets from tax agents or creditors than that he was hiding them from narcotics agents. The desire to hide assets does not automatically give rise to the inference that the assets were illegally acquired. That McFadden used cash makes the transaction no more suspicious—if concealing assets he would prefer to leave no paper trail.

The government relies heavily on McDougald's false exculpatory statements to buttress this weak circumstantial evidence. Without these statements it seems doubtful that the government would have proceeded at all. McDougald's false state-

ments are actually of little value, however, because they do not tend to establish guilty knowledge at the time of the automobile purchase. The government must establish that McDougald's guilty knowledge of the true nature of the Beretta purchase concurred with the purchase itself. *See* W. Lafave & A. Scott, Criminal Law § 3.11, at 268 (2d ed. 1986) ("it is a basic premise of Anglo–American criminal law that the physical conduct and the state of mind must concur").

McDougald purchased the Beretta on June 4, 1990. He did not make his first false exculpatory statement until February 9, 1991, when he was questioned by police about his ownership of the Beretta. This was almost a month after Ronald Watts had been arrested for conspiracy to distribute cocaine, and after McDougald had witnessed a search of Watts' residence by police. Even if McDougald did not know the specific reason for Watts' arrest and the search of his house, his personal knowledge provided sufficient reason for caution in answering police questions. His false testimony at trial obviously came long after he discovered that the government thought his role in the purchase of the Beretta was criminal. In short, Bobby McDougald lied about his role in the purchase of the Beretta only after he was put on notice that he had done something wrong. This evidence is irrelevant to his state of mind on June 4, when he purchased the car.

In the civil context, the Supreme Court has concluded that once a defendant is made aware of a mistake, false exculpatory statements are of little weight when evaluating the defendant's state of mind at the time of the mistake. *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). This circuit and others have applied the same principle in the criminal context, where the burden of proof is even higher. In *United States v. Sizemore*, 632 F.2d 8, 13, 14 (6th Cir.1980), the court found that false exculpatory statements by the defendant could have been made to protect a family member or avoid guilt by association, and did not by them-

selves establish guilt. The *Sizemore* court relied in part upon *United States v. Johnson*, 513 F.2d 819 (2d Cir.1975), for this conclusion. In *Johnson*, the court held that

> "falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt."

*Id.* at 824.

This observation in the *Johnson* case guides our thinking here. In this case, the circumstantial evidence of McDougald's guilty knowledge is weak, and is as hospitable to an interpretation consistent with his innocence as with the government's theory of guilt. There is no evidence that McDougald knew Watts and McFadden were in the drug business. If McDougald did not know they were in the drug business, his purchase of a car for McFadden does not tend to establish that he knew the $10,000 was drug money. Lastly, his false exculpatory statements do not prove guilty knowledge at the time of the purchase because these statements came after he was put on notice that the government was suspicious about his dealings with Watts and McFadden.

Therefore, we do not believe that a rational jury could find the defendant guilty "beyond a reasonable doubt." That he had knowledge that the $10,000 was drug money is entirely speculative. The only government witnesses who were in position to testify about defendant's knowledge, Ronald and Darlene Watts, testified that the defendant chastised Ronald Watts for lighting up a marijuana cigarette and refused to drive further until he put it out.[1] They had known the defendant for many years. They testified that he opposed drugs and would not involve himself in a

---

1. Ronald Watts testified on cross-examination as follows:
   Q. In fact, your Uncle Bobby is absolutely and totally opposed to drugs or selling drugs; isn't that correct?

   A. Yes, he was.
   Q. You know that very dramatically; don't you?
   A. Yes, sir.

drug transaction.[2] They could not testify that the defendant knew that they dealt in drugs or that their associate, McFadden, dealt in drugs. Their testimony tends strongly to negate any such inference. In light of the weakness of the government's circumstantial evidence, this testimony from the government's own two key witnesses tends to undermine an inference that defendant knew he was laundering drug money.[3] The risk here is simply too great that an innocent man has been convicted.

For the reasons stated above, we REVERSE the judgment of the district court.

BOGGS, Circuit Judge, dissenting.

There is no significant dispute over the state of the facts or the record in this case. The dispute is over whether, in the words of *Jackson v. Virginia*, 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), "any rational trier of fact" could believe beyond a reasonable doubt that McDougald used drug proceeds when he purchased a car for Eddie McFadden and that he knew he was using drug proceeds. A recitation and proper analysis of the evidence introduced at trial convinces me that there exists at least one rational person who could find that this is what occurred.

The key persons in this drama are: McDougald, the defendant; Ronald Watts, a close friend of McDougald's who was also involved in a drug conspiracy centered in California; and Eddie McFadden, a major drug dealer in California, a federal fugitive, and the center of the California drug ring.

Watts recruited McDougald to drive from Columbus, Ohio to California in a van belonging to Watts. After driving across the continent, McDougald was to pick up McFadden at a McDonald's. After a failure of connections, McFadden was ultimately located and McDougald drove McFadden and an associate back across the country to Columbus. Within a day or two after the return, Watts asked McDougald to come over to his house and buy a car for McFadden. While at the house, McDougald saw McFadden give $10,000 to an associate, Burton. Watts, McDougald, and Burton went to a dealership, where the car, a Beretta, had already been picked out. McDougald pretended to be the person buying the car, took the cash from Burton, literally "under the table," and then paid for the car and registered it in his own name. Two days later, McDougald drove McFadden back to California in the new car and then flew back to Columbus.

The following year, police who were investigating the California drug ring asked McDougald about cars that he owned.[1] McDougald answered their questions with a series of lies, designed to conceal his connection with the car, as well as McFadden's. In addition, at trial McDougald denied buying the car for McFadden and testified to a series of other events involving

---

Q. In fact, you were driving in a van with Mr. McDougald at one time, pulled out what was obviously a marijuana cigarette to light it, what happened?
A. He told me to put it out.
Q. Did he pull off the road, too, and told you to put it out?
A. Yes.
Q. And never have any of that in his presence again; isn't that right?
A. Yes, sir.

2. Darlene Watts testified on cross-examination as follows:
Q. In fact, isn't it true now, Mrs. Watts, that you have never seen Mr. McDougald, Uncle Bobby, use drugs?
A. No, sir.
Q. You know that Uncle Bobby is opposed to drugs; don't you?
A. Yes, sir.
Q. From your association with your husband, he knows that Uncle Bobby is opposed to drugs?
A. Yes, sir.
Ronald Watts testified on cross-examination as follows:

Q. Mr. Watts, knowing your Uncle Bobby as you do—
A. Yes, sir.
Q. —do you believe that he would ever directly or indirectly in any way involve himself in a drug transaction?

A. No, I don't think he would be involved. Because from my understanding from him, I know he's totally opposed against drugs to my knowledge.
Q. He wouldn't assist in any way anyone in the dealing of drugs?
A. No, sir, not to my knowledge. No, he's against it.

3. Ronald Watts testified on redirect examination as follows:
Q. Yet your uncle did assist Eddie McFadden to buy a car with drug money; didn't he?
A. I don't—to be honest with you, I don't know if he knew it was drug money or not.

1. Police questioned McDougald because, while engaged in the execution of a search warrant at the Wattses' home, officers located a set of keys

the car that were directly contradicted by the government's evidence. As the court correctly states, a rational jury could certainly conclude "that this entire story was fabricated." At 261.

The court's entire opinion appears to be based on the notion that it is within the realm of physical possibility that McFadden has substantial sources of income other than drug dealing; that he procured the cash given to McDougald from these sources; and/or that McDougald had no idea of McFadden's sources of income. While this is a scenario that a credulous juror could certainly believe, the question is whether a rational juror could believe to the contrary. I believe that such a juror could.

First, a drug dealer with other sources of income is not thereby insulated from money laundering charges. The government clearly proved that McFadden was a drug dealer with substantial income from drugs. The government is not required to prove that the drug dealer has no other income. *United States v. Jackson*, 935 F.2d 832, 839–41 (7th Cir.1991). In *Jackson*, the defendant had sufficient legitimate income to account for his purchases. In denying a motion to dismiss for insufficiency of the evidence, the court held that the government need not trace the "origin of all funds deposited into a bank account to determine exactly which funds were used for which transaction." *Id.* at 840.

The court's theory would appear to provide substantial protection for the drug dealer of independent wealth that would not be available to the purely entrepreneurial drug dealer. Thus, a drug dealer with a $1,000,000 trust fund would be able to allege that any purchase up to the interest on his trust corpus came from that source. There is no law to this effect. Even *Webster*, 960 F.2d at 1308, cited by the court, does not stand for the proposition that it is impossible to commit money laundering unless you buy something that costs more than all of your legitimate income. Otherwise, any indictment focusing on the pur-

chase of item X could be defeated by showing that there is legitimate income of at least that amount. In fact, a person who has substantial illegal income is almost always in the position of spending commingled cash when using large amounts of cash. In our case, of course, there was no evidence of a legitimate source of income for McFadden, and the government cannot be faulted for not proving a negative.

As to McDougald's knowledge, the evidence here shows considerably more than "guilt by association." The evidence against McDougald is not that he went bowling or to church with Watts; or that they have friends and acquaintances in common. Instead, the evidence shows that McDougald took three cross-country trips at the behest of Watts and McFadden, for no apparent legitimate purpose; that McDougald lied repeatedly about these transactions; and that McDougald knew that he was engaged in concealing McFadden's connection with the car.

Based on these facts, it is not only rational to believe that drug money was involved, it requires an unusually trusting and credulous nature to doubt that drug money was involved.

McDougald may not allow an assumption of "deliberate ignorance" to shroud his knowledge. *See United States v. Strickland*, 935 F.2d 822, 826–827 (7th Cir.1991) (upholding a jury instruction that knowledge can be inferred from deliberate ignorance). Nor was the government in any way lax in failing to produce evidence that would normally be available. The quality of proof in this case shows no indication of differing significantly from any other money laundering case. A drug dealer in McFadden's position, under the majority's rationale, would appear to be able to use a pawn like McDougald with impunity so long as no witness could be found to testify that McDougald was unmistakenly told, in the presence of others, "we are drug dealers and I am giving you drug money." The law does not require so extensive a burden. I therefore dissent.

Before: MERRITT, Chief Judge; MARTIN and BOGGS, Circuit Judges.

---

to the Beretta and registration tags that named McDougald as the purchaser of the vehicle.

### ORDER

June 16, 1993.

The panel has considered the petition for rehearing and is of the opinion that rehearing is unnecessary. It is therefore ADJUDGED and ORDERED that the petition for rehearing shall be, and hereby is, denied. It is further ORDERED that the addendum to the opinion attached to this order shall be, and hereby is, filed and made a part of the opinion in this case.

### SUPPLEMENTAL OPINION

PER CURIAM.

The government's motion for rehearing has been denied, but the court grants the government's request that we reconsider language regarding the evidentiary significance of the defendant's false statements to police and at trial. The language objected to is:

> In short, Bobby McDougald lied about his role in the purchase of the Beretta only after he was put on notice that he had done something wrong. This evidence is irrelevant to his state of mind on June 4, when he purchased the car.

We agree that this statement is overly broad. McDougald's false exculpatory statements are relevant to his state of mind at the time of the purchase. In this case, however, the events intervening between the time of the car purchase and the time of the false statements reduce or eliminate the strength of any inferences that may be drawn from these statements.