25 F.3d 1050
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Rose Marie CARADINE, Defendant-Appellant.
 No. 93-3570.
 United States Court of Appeals, Sixth Circuit.
 June 7, 1994.
 
 Before: NELSON and SILER, Circuit Judges; and HACKETT, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Rose Marie Caradine appeals her conviction on one count of money laundering in violation of 18 U.S.C. Sec. 1956(a)(1)(B)(i). Caradine seeks to overturn the conviction on the ground that the government failed to prove three of the four elements required to establish the crime of money laundering.
 
 
 2
 * On March 5, 1992, members of the Mahoning County Drug Task Force searched the residence of Roberto Roper and Rose Marie Caradine in Youngstown, Ohio. Officers seized a 9mm Beretta and clip, $1,100 in cash, and $30,404 in cash in 3 Crown Royal bags which were stuffed in a woman's handbag found behind the television set in the living room. They also seized records and documents showing large expenditures of money at Leroy Jewelers and Great Garage Doors, the transfer of money by Western Union, and telephone bills. Officers also found a Nissan Pathfinder truck and a condom filled with cocaine in the garage. Rose Marie Caradine was present in the home at the time it was searched.
 
 
 3
 To prove its charge of conspiracy to distribute cocaine against the co-defendant Roberto Roper, the government called and examined Sally Rivera, Ramona Mercado, and Kay Seneca as witnesses. Ramona Mercado testified that she met Roper in New York City when she was 13 and began dating him when she was 17 years of age.
 
 
 4
 In the early part of 1989, Mercado, at Roper's instruction, took 8 ounces of cocaine from New York to Youngstown to sell. She returned the profits to Roper in New York. In 1989, Mercado and Roper moved to Youngstown and began to sell cocaine in the area. Roper purchased a house and put it in Mercado's name. Mercado testified that by 1990, Roper was dealing in kilogram quantities of cocaine for which he paid about $26,000, selling 1 to 2 kilograms per month. Roper regularly collected his money from the sale of the cocaine on Friday and paid his "workers" on Sunday. At some point in 1991, Roper moved out of Mercado's home and into Caradine's home.
 
 
 5
 In early 1992, Mercado moved out of the residence she had shared with Roper and moved into a home on another street. Before she left, Mercado took photographs of cocaine and a gun which were in their home and identified the cocaine and gun as Roper's. She testified to having stored up to $35,000 cash at a time for Roper in her home.
 
 
 6
 Mercado also testified that she had seen Caradine with a large amount of cash on 3 separate occasions. One of those occasions was when she and Caradine were going to federal court. Caradine showed Mercado a large sum of cash and stated that she did not want to put her bag through the "machine," the detection device at the door of the courthouse.
 
 
 7
 Mercado admitted that she bore a grudge against Roper because he had denied the paternity of their last child, that she had used cocaine, and that she had written a letter to Roper saying she would "get him." She said that Roper had worked at the East Side Civics Club during the period in question, but only for approximately 3 months.
 
 
 8
 The government also called Sally Rivera as a witness. Rivera testified that her home had been searched by local police on August 2, 1991, and that the police had found her triple beam scale, her pocket scale, her address book, and 10 ounces of cocaine. She stated that she had received the 10 ounces of cocaine from her supplier, Roberto Roper. Rivera stated that she had started dealing in cocaine with Roper in the winter of 1991. She received 1/2 to 1 ounce quantities from him at first, then moved up to 2 to 3 ounces per week. Her sales increased and she received 5 ounces, then 10 ounces per week from Roper. She testified that during the summer of 1991, she and Roper had "broken down" at least 3 kilograms of cocaine at various locations around Youngstown. Rivera admitted that she had been granted leniency as to the county charges pending against her by agreeing to testify against Roper.
 
 
 9
 Kay Seneca told the jury that she had been arrested on a charge of possession of cocaine and then began to cooperate with the police. During the course of her cooperation in making a case against Seneca's source of supply, Seneca met Roberto Roper. She agreed to assist the Federal Bureau of Investigation in making a case against Roper in exchange for $5,000 in relocation money.
 
 
 10
 Seneca met Roper in early October, 1991, at Debbie Mitchum's house in Youngstown. Seneca recorded many of her telephone and in-person conversations with Roper. These recordings were played to the jury. Two of the conversations that were not recorded were recounted by Seneca from the witness stand. Seneca testified that on November 2, 1991, she received a page from Roper who said he wanted to "do business." At Roper's direction, she went to an apartment and was met by Roper, Jeanette Gooden, a woman named Tracy from New Jersey, and an older woman. She was quizzed on her knowledge of the cocaine trade and then left.
 
 
 11
 Approximately five days later, Gooden paged Seneca and requested that she return to the same apartment. When Seneca arrived, she saw Roper cutting up 4 or 5 kilograms of cocaine. Roper was using a large digital scale, cutting the cocaine into smaller quantities and then weighing it. She was put into a bedroom with Gooden's daughter and could hear the comings and goings of people through the living room area. When she was allowed out of the bedroom, she saw Roper splitting up the last kilogram of cocaine.
 
 
 12
 The government presented evidence of two transactions in which vehicles were purchased using straw purchasers to prove that Roper and Caradine had engaged in money laundering. Caradine and Roper were convicted on Count 7 of the indictment, based on the purchase of a Nissan Maxima.
 
 
 13
 In November, 1990, Roper supplied the cash to purchase a 1990 Nissan Maxima, titled in Caradine's name. Caradine's grandfather Ladell Turner testified that he was asked by either Caradine or Roper to take the two out to Greenwood Nissan, a car dealership. After an initial discussion at the dealership, there was a disagreement about something and Roper asked for his down payment back and they went outside. After a short time, all three went back into the dealership and the deal was completed. Either Roper or Caradine handed Turner $14,000 in cash. Again, he could not recall which of the two did this. He gave the money to the cashiers at the dealership. Caradine paid Turner approximately $50 for his services.
 
 
 14
 After the purchase, Turner was approached by federal agents and asked if he had given Caradine the money for the car. Although at first Turner told the agents that he had used money from his savings, he later told the agents the money had come from Caradine or Roper.
 
 
 15
 The salesman for the Maxima was Charles Partee. Partee told the jury that on November 6, 1990, Alonzo Dilligard (a/k/a Roper) came into the Nissan dealership and picked out a Maxima to purchase for his girlfriend. He paid $7,000 cash as a down payment on the car.
 
 
 16
 Partee further testified that on November 12, 1990, Dilligard returned to the dealership, accompanied by a woman and an older man. After a disagreement, the car was purchased for $22,000. That included the $7,000 cash down payment, $1,000 for trade-in on another car, and another $14,000 in cash. Partee identified two receipts for the car. The first one was made out to Alonzo Dilligard and the second was made out to Ladell Turner.
 
 
 17
 Roper alone was convicted on Count 6 of the indictment, a transaction involving the purchase of a Nissan Pathfinder at the same dealership in January, 1992. At trial, the salesman Clarence Allison testified that the first order form was made out to Michelle McGee as the purchaser, and that a $3,500 cash down payment was made. Allison identified Roper as the man who accompanied McGee to the dealership and picked out the truck. Three days later, a further payment of $5,500 in cash was made, the truck was picked up, but was titled to a Roslyn Brown.
 
 
 18
 Roslyn Brown testified that Rose Marie Caradine phoned and asked her to purchase the Pathfinder for Roper because she had a good credit rating and because Roper was having difficulty with credit. A few days after the first conversation regarding the purchase, Caradine called back and asked Brown if she would assist Roper in obtaining the truck. Brown agreed.
 
 
 19
 After Roper picked Brown up to take her to the dealership to purchase the truck, Roper received a call from Caradine on the car phone which was installed in the Maxima. Brown spoke to Caradine and then to a woman at an insurance company. Brown and Roper then went to the insurance company before going to the dealership to pick up the truck. At the dealership, Brown signed all the necessary papers while Roper paid the salesman more cash. Roper drove the Pathfinder home and Brown drove the Maxima. Brown gave the payment book to Caradine.
 
 
 20
 Brown told the jury that she was later interviewed by federal agents. She initially told the agents that the money used to purchase the truck was hers. Later in the interview she told them what had actually happened.
 
 
 21
 On the day the search warrant was executed by the Mahoning County Drug Task Force, Caradine was present in the home she and Roper shared. She was interviewed by Special Agents Patricia Reese and Denise Dolesh of the Internal Revenue Service. Caradine told the agents that the Maxima was purchased by her and her grandfather using Social Security money and money he had saved. She stated that she received $430 per month in welfare payments. She also told the agents that the Pathfinder belonged to Roslyn Brown, and that Brown had brought over the coupon payment book. Caradine did not explain why the payment book was at her home. Caradine also denied she had a safe deposit box, but later said that the $5,000 in a safe deposit box had come from a bag under the dresser.
 
 II
 
 22
 Under 18 U.S.C. Sec. 1956(a)(1)(B)(i), the federal money laundering statute, the government must prove beyond a reasonable doubt that the defendant: 1) knowingly conducted a financial transaction; 2) was using funds which had come from a specified unlawful activity; 3) knew that the money was from a specified unlawful activity; and, 4) participated in the transaction with the intent to conceal or disguise the nature or source of the funds involved. United States v. Beddow, 957 F.2d 1330, 1334 (6th Cir.1992) (citing United States v. Blackman, 904 F.2d 1250, 1256 (8th Cir.1990)). See also, United States v. McDougald, 990 F.2d 259 (6th Cir.1993). Caradine's appeal challenges the sufficiency of the government's evidence on the last three requirements.
 
 
 23
 The test for weighing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court must consider all of the evidence, direct as well as circumstantial, in the light most favorable to the government. See United States v. Seltzer, 794 F.2d 1114, 1119 (6th Cir.1986), cert. denied, 479 U.S. 1054 (1987). The government is entitled to the benefit of all reasonable inferences that can be drawn from the evidence. See United States v. Woods, 877 F.2d 477, 479 (6th Cir.1989).
 
 
 24
 1. Source of the funds.
 
 
 25
 The first element Caradine challenges is that the money used for the purchases originated from drug sales. She contends there was no direct testimony or documentary evidence that the funds used to purchase the Maxima were the proceeds of drug dealing and that there was no evidence that any of the funds came from Caradine. Caradine cites United States v. McDougald, 990 F.2d 259, 261 (6th Cir.1993) for the proposition that the fact that Roper may have been a drug dealer is "not sufficient proof that his every penny derived from drug sales." McDougald, 990 F.2d at 261. Caradine argues that there was evidence from two government witnesses that Roper owned or had an interest in a bar in Youngstown and her own testimony that Roper had been employed doing auto body work in the past, showing that Roper had income other than from drug sales.
 
 
 26
 Caradine also argues that the government failed to prove that the money used to purchase the car was drug money since the government's proofs on Roper's drug dealings were limited to 1991, while the purchase transactions for the Nissan Maxima, the subject of Count 7, took place in November, 1990. She argues that the testimony of Mercado, Seneca, and Rivera all related to Roper's drug activities in 1991.
 
 
 27
 However, the government correctly argues that there was sufficient evidence to support a finding that the purchase of the Maxima was made with drug proceeds from the relevant time period. The government notes that Ramona Mercado testified that she and Roper moved to Youngstown in the summer of 1989, that neither she nor Roper ever worked, and that they were able to pay their bills by selling cocaine. She stated that Roper continued to support them by selling cocaine after he purchased a house for her. Further, it was stipulated that Roper did not file any tax returns for the years 1989, 1990, and 1991, giving rise to the inference that he had no legitimate income. Finally, the other sources of the funds offered by the defendants, Roper's ownership of a bar or club, and Roper's work at a body shop were for short periods of time or merely references and not proven.
 
 
 28
 2. Knowledge of the source of the funds.
 
 
 29
 Caradine argues that even if there is sufficient proof that the funds used to purchase the Maxima were drug proceeds, there is insufficient evidence to prove that she knew the source of the money. She contends that none of the government witnesses who testified to Roper's activities involved Caradine in any drug activities. The only drugs found during the search of the home were in a condom lying on the floor of a garage which was detached from the house. Although a large quantity of cash was located, Caradine says that there was no direct testimony or documentary evidence either identifying that cash as drug proceeds or proving that Caradine knew that it was drug money.
 
 
 30
 Caradine argues that in McDougald, supra, this court reversed a conviction on a money laundering charge which was supported by more substantial evidence than that which exists in this case. In McDougald, the government offered evidence that the defendant had a relationship to the drug dealers, that he acquiesced in the suspicious acquisition of a car, and that he lied to police about what had happened. The court held that the facts did not provide enough to prove the requisite knowledge of the source of the funds. McDougald, 990 F.2d at 263.
 
 
 31
 Caradine also says that an understanding of her relationship with Roper would allow one to accept that she could be involved with him without knowing of his drug activities or the source of his income. She contends that the evidence of her youth and inexperience lead to a reasonable conclusion that Roper exerted total control over her life. Moreover, Caradine argues that Roper hid his drug activities completely from her, giving her no reason to question his activities, resources or his reasons for telling her to do things.
 
 
 32
 Caradine argues that there is no indication that she would have seen anything unusual or suspicious about the manner of acquiring the Maxima. There was no testimony from Partee, the salesman in the Maxima transaction, which indicated that the sale of the car was unusual or suspicious. Caradine also says that she did not lie to anyone about the purchase as did the defendant in McDougald.
 
 
 33
 However, the government refers to much circumstantial evidence in the record that supports the element of knowledge. Knowledge of the source of laundered funds can be proven by circumstantial evidence, United States v. Scruggs, 549 F.2d 1097, 1104 (6th Cir.) cert. denied, 434 U.S. 824 (1977).
 
 
 34
 First, Mercado stated that Roper kept his money rolled up in a bag, and that she had held as much as $35,000 for him. When Caradine's house was searched, $31,504 cash was seized, mostly concealed in Crown Royal bags. Mercado also told the jurors that she had seen Caradine on 3 occasions with large amounts of cash. The circumstantial evidence supports an inference that Caradine knew the source of the money based on Mercado's knowledge from her own relationship with Roper and the similar circumstances of their living arrangements.
 
 
 35
 Second, the following bills and receipts were found in the dining room, all in the name of Rose Marie Caradine:
 
 
 36
 Description Amount
----------------- -------
Allstate Insurance Company $259.00
Ohio Bell bill 162.88
Centel Cellular phone bill 235.64
Centel Cellular phone bill 327.19
Great Garage Doors bill 613.00
Progressive Insurance Co. bill 749.80
Norwest Financial Co. 300.00
 Leroy Jewelers - payment 200.00
 " " " 200.00
 " " " 100.00
 " " ' 500.00
 " " " 810.00
 " " -- purchase 2108.95
 " " " 899.00
 " " " 2119.50
 
 
 37
 The agents also found the registration for her 1990 Maxima.
 
 
 38
 The jury was entitled to look at the paperwork found in the home Caradine shared with Roper. In so doing, they could reasonably find that almost everything belonged to Caradine, indicating large expenditures without the benefit of any appreciable legitimate income.[1] From this, a reasonable jury could infer Caradine's knowledge of the source of her funds. The jury was also entitled to consider not only the false statements she made to the special agents at the time her house was being searched, but the congruence of those statements with the false statements her grandfather and Roslyn Brown initially made to agents when they were interviewed.
 
 
 39
 Direct evidence also showed that Caradine had procured her friend Roslyn Brown to be the straw purchaser of the Pathfinder and that Brown gave Caradine the payment book for that truck. The payment book was found in Caradine's home in the dining room. The jury was entitled to look at the purchase of the Pathfinder in evaluating Caradine's knowledge during the purchase of the Maxima.
 
 
 40
 Finally, cocaine was found in the garage of Caradine's home. While she argues that the cocaine was in a garage which was detached from her home, a rational jury could have inferred her knowledge of its presence on her property as easily as it could have inferred a lack of knowledge.
 
 
 41
 Further, McDougald, supra is factually distinguishable from the instant case and defendant's reliance on it is misplaced. In McDougald, the relationship between the defendant and the drug dealer McFadden was casual and brief. In the instant case, Caradine and Roper lived under the same roof, and had children together. In McDougald, the defendant was the person procured to buy the automobile. 990 F.2d at 260. In the instant case, there is evidence sufficient to allow the conclusion that Caradine was involved in procuring her grandfather to act as if he were purchasing the car for her.
 
 
 42
 There was no connection shown between the defendant and the narcotics ring in McDougald. The government's own witnesses testified that McDougald did not tolerate drugs. Id. at 263. The defendant's acquaintance's drug business was in California, far removed from Columbus, Ohio, where the car purchase occurred. Id. at 260. By contrast, drugs were found in Caradine's garage and Roper's drug business was conducted in the same town while she was in a close relationship with him.
 
 
 43
 In McDougald, the defendant's friend Watts, who got him into the straw purchase deal, had a legitimate business separate from his drug dealing, and the defendant was aware of that legitimate business. Id. In the instant case, Roper had little or no legitimate income from the time he arrived in Youngstown to sell cocaine in 1989 until he ran the East Side Civics Club for a short period in 1992.
 
 
 44
 McDougald is clearly distinguishable from the case at bar. The holding does not support Caradine's position that there was insufficient evidence of Caradine's guilty knowledge because the circumstantial evidence in McDougald was much weaker in every respect and the defendant's guilty knowledge "entirely speculative." Id. at 263.
 
 
 45
 3. Intent to conceal or disguise the nature or source of the funds involved.
 
 
 46
 As to the third element challenged, Caradine argues that the requisite intent is absent from the record. Caradine's grandfather Ladell Turner testified that he went with "Bert" (another of Roper's names) and his granddaughter Rose Marie Caradine to the car dealership. He did not remember who asked him to go with him. Nor did he remember who gave him the money to give to the dealer or to whom the money belonged. Citing McDougald, Caradine argues that it is not enough to show that title was put in her name or that cash was used for the purchase. Id. at 262.
 
 
 47
 The government responds that the direct evidence in this case shows that Caradine or Roper asked Caradine's grandfather to be the straw buyer for the Maxima, that he did so, and that either Roper or Caradine handed him the cash to be given to the dealer in payment for the car. A reasonable jury could conclude beyond a reasonable doubt that it was more probable that it was Caradine who solicited her grandfather to make the straw purchase of the Maxima because of her relationship with him and because she paid him some money for assisting them. This solicitation would support a finding of her intent to conceal the nature of the funds.
 
 
 48
 A money laundering conviction is supported by constitutionally adequate evidence only where "the record contains sufficient evidence to convince a reasonable juror beyond a reasonable doubt that [defendant] knowingly laundered drug money." Id. at 261. Mere association with a drug dealer is not constitutionally adequate evidence that money laundering was knowingly undertaken. Id. at 262. However, in this case, Caradine's relationship with Roper went far beyond mere association. The jury was entitled to evaluate the credibility of the witnesses in determining whether Caradine knowingly committed a crime. There was clearly direct and circumstantial evidence sufficient to allow a rational trier of fact to find that each of the elements of money laundering had been proven against defendant Caradine beyond a reasonable doubt.
 
 III.
 
 49
 For the reasons stated above, we AFFIRM defendant Rose Marie Caradine's conviction.
 
 
 
 *
 The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Courts disagree on whether the evidence of the lack of a legitimate source of income alone is sufficient to support the conclusion that the source of funds is from drug dealing. See McDougald, 990 F.2d at 261. However, the jury was entitled to consider the insufficient legitimate income as part of the circumstantial evidence in this case