73 F.3d 363
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony James PALAZZOLO and Richard Rosenbaum, Defendants-Appellants.
 Nos. 94-1364, 94-1553.
 United States Court of Appeals, Sixth Circuit.
 Dec. 26, 1995.
 
 Before: LIVELY, RYAN and SILER, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 Two jointly-tried defendants appeal from their jury convictions for conspiracy to launder money that was proceeds of drug violations, to structure transactions to avoid triggering a bank's reporting requirements with respect to large cash deposits and to avoid filing financial disclosure forms required of businesses engaging in cash transactions. In addition, they appeal from their convictions for substantive offenses in carrying out the purposes of the conspiracy. This opinion addresses the defendants' appeals from convictions for the substantive offenses only, as we have decided the appeal from the conspiracy convictions in a published opinion released simultaneously with this opinion.
 
 
 2
 The issues on appeal are whether there was sufficient evidence to support the convictions for the substantive offenses, and whether statements by government counsel constituted prosecutorial misconduct of a degree to require reversal. One defendant also appeals from his sentence.
 
 
 3
 For the reasons that follow, we affirm the defendant Palazzolo's conviction, affirm in part and reverse in part the defendant Rosenbaum's conviction and remand for resentencing. We also find that some of the prosecutor's statements, while unjustified, were not sufficiently egregious or pervasive to require reversal.
 
 I.
 
 4
 In November of 1989, Corporal Dennis Travanut of the Royal Canadian Mounted Police met with Lorenzo Viviano, representing himself to be a heroin dealer interested in relocating his business to Windsor, Ontario. (Trans.Vol. II at 19-20) During one of several preliminary meetings with Viviano, Travanut revealed to Viviano elaborate details about his purported drug trafficking organization. (Trans.Vol. II at 58-61) Viviano introduced Travanut to the defendant Anthony Palazzolo in February of 1990. (Trans. Vol. II at 26)
 
 
 5
 The three met several more times and discussed various methods to launder money. On May 29, 1990, Palazzolo, Viviano and Travanut met in a Detroit, Michigan produce warehouse, where Palazzolo discussed with Travanut a money laundering scheme involving the exchange of small bills for large bills. (Trans.Vol. II at 69, 71-73; see Trans.Vol. II at 44-45) Travanut offered to pay a total of five "points" (i.e., percent commission) for Palazzolo's help with a $50,000 exchange. (Trans.Vol. II at 72) Travanut also confirmed during the meeting that Palazzolo would not "have to worry about banks or anything...." (Tape 1A at 3) Two attempts to launder money failed in June and July of 1990 because the suppliers of large bills failed to produce them.
 
 
 6
 A series of meetings and transactions in late summer and fall of 1990 resulted in successful exchanges. On August 24, Anthony Palazzolo told Travanut that he and his brother, Salvatore Palazzolo, knew a gold dealer who would help launder Travanut's small bills. (Trans.Vol. III at 6) During the meeting, Anthony Palazzolo announced that his brother would be involved in the laundering scheme and that they would "do it without [him]" because he was on parole and under police surveillance. (Tape 4A at 11; Trans.Vol. III at 10-13) Travanut met with Viviano a few days later and again discussed with Viviano his purported heroin trafficking ring. (Trans.Vol. III at 30-31) Viviano told Travanut that the gold dealer was willing to exchange $75,000 in cash for gold coins. (Trans.Vol. III at 29)
 
 
 7
 Travanut, Anthony Palazzolo and Viviano met in a downtown Detroit hotel room on August 31 to discuss the details of the cash-for-gold deal. (Trans.Vol. III at 33, 35) Palazzolo explained that the gold dealer would make out a receipt for the cash that would be destroyed when the gold was delivered so there would be no record of the transaction. (Trans.Vol. III at 36) They agreed on six points for the deal. (Tape 5A at 19) During the meeting, Travanut asked Palazzolo if he would like to join his heroin trafficking organization, to which Palazzolo responded that he "want[ed] nothin' to do with it." (Tape 5A at 5-6; Trans.Vol. III at 38-39, 48-49)
 
 
 8
 On September 24, Travanut gave $75,000 in small bills to Viviano at a Greyhound bus station. (Trans.Vol. III at 70) Viviano and Salvatore Palazzolo delivered the cash to Birmingham Stamp and Coin Shop, which was owned by the defendant Richard Rosenbaum. (Trans.Vol. III at 76; Trans.Vol. V at 147-48) Later that day, Travanut met with Viviano again and took from Viviano a "receipt" for the cash written on the back of Rosenbaum's business card and signed by Rosenbaum. (Trans.Vol. III at 46-47, 80) On September 25 and 26, Rosenbaum made cash deposits of $40,000 and $35,000, respectively, into his business bank account. (Trans.Vol. VI at 107, 109-10) On September 27, Travanut returned the "receipt" to Viviano and gave to Viviano $2,000, which Viviano said was Rosenbaum's share of the point money. (Trans.Vol. III at 84, 86-87) Travanut received the gold coins later that day and gave Viviano the balance of the point money. (Trans.Vol. III at 88, 97) In October of 1990, Viviano told Travanut that he could arrange a second transaction, and stated that he, Anthony and Salvatore Palazzolo, and the "gold guy" had shared the point money in the last transaction. (Trans.Vol. III at 101-02)
 
 
 9
 The second cash-for-gold transaction began on October 29 and proceeded in much the same way as the first. Travanut gave a bag containing $75,000 in small bills to Viviano. (Trans.Vol. III at 103-05) Viviano then drove to a restaurant where the Palazzolo brothers entered the car. (Trans.Vol. V at 215) After about three minutes, Anthony Palazzolo got out of the car, and Viviano and Salvatore Palazzolo drove to Rosenbaum's store. (Trans.Vol. V at 216) On October 30, Rosenbaum deposited $49,000 in cash and $14,000 in checks into his business account. (Trans.Vol. VI at 112-14) On the same day, $8,000 in cash was deposited into his personal account. (Trans.Vol. VI at 115) Again, Travanut received a "receipt" and had given $1,500 to Viviano purportedly for Rosenbaum's share of the points in advance of the gold delivery. (Trans.Vol. III at 106, 112-13)
 
 
 10
 Rosenbaum's business was exempt from currency transaction filing requirements, which require banks to report certain cash deposits, for cash deposits up to $50,000. (Trans.Vol. V at 108-09, 117) None of the transactions between Viviano and Rosenbaum were reported, either by way of the Internal Revenue Service (IRS) Form 8300 that Rosenbaum was required to file upon receipt of more than $10,000 in cash, or by way of the currency transaction reporting forms that Rosenbaum's bank would have filed had Rosenbaum not split up his cash deposits. (Trans.Vol. VI at 108, 110, 114-15; Trans.Vol. VII at 33-34, 46) Records reflecting a receipt of the money for those deposits were never found. (Trans.Vol. VII at 28-30) Travanut never met or talked with Rosenbaum, and no witness testified that Rosenbaum knew of Travanut's purported drug dealing.
 
 II.
 
 11
 In a 22-count indictment, Anthony Palazzolo was charged with the following: one count of conspiracy with three unlawful purposes (Count 1); three counts of money laundering (Counts 8, 11, 17); eight counts of interstate travel in aid of racketeering (ITAR) (Counts 3, 5, 7, 10, 13, 14, 19, 20); two counts of causing a failure to file Form 8300s (Counts 15, 21); and two counts of structuring transactions to avoid a bank's reporting requirements (Counts 16, 22). Rosenbaum was charged with being a member of the Count 1 conspiracy. He was also charged with two counts of money laundering, four ITAR counts, two counts of failing to file Form 8300s, and two counts of structuring transactions to avoid his bank's reporting requirements. Viviano pled guilty and did not testify at the trial.
 
 
 12
 After the close of the government's case, the district court denied Rosenbaum's motion for a judgment of acquittal on all counts charging him and Palazzolo's motion for acquittal on Counts 11 through 22. (Trans.Vol. VII at 94-99, 106) Between closing arguments and jury instructions, both defendants orally moved for a mistrial based on alleged misconduct during the government's closing argument. (Trans.Vol. VIII at 162-63) The court denied their motions, stating that curative instructions would be or had been given to the jury to protect the defendants sufficiently from prejudice. (Trans.Vol. VIII at 160-61)
 
 
 13
 The jury returned verdicts of guilty on all counts against Palazzolo and against Rosenbaum on all counts charging him except the ones accusing him of money laundering. The court later granted both defendants' motions for a new trial on the "structuring" charges because of an error in the jury instructions.
 
 III.
 
 14
 Palazzolo alleges that there was insufficient evidence to support a verdict against him on charges of laundering money believed to be drug proceeds (in violation of 18 U.S.C. Secs. 1956(a)(3)(B) and 2); interstate travel with intent to aid in laundering drug proceeds (in violation of 18 U.S.C. Secs. 1952(a)(3) and 2); and willfully causing the failure to file a Form 8300 (in violation of 26 U.S.C. Secs. 6050I(f)(1)(A), 7203; 18 U.S.C. Sec. 2). Rosenbaum challenges the sufficiency of the evidence to support his ITAR convictions and his convictions under 26 U.S.C. Secs. 6050I and 7203.
 
 
 15
 In reviewing the sufficiency of the evidence presented at trial, this court must view the evidence in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see United States v. Woods, 877 F.2d 477, 479 (6th Cir.1989); United States v. McDougald, 990 F.2d 259, 261 (6th Cir.1993). Further, circumstantial evidence is entitled to the same weight as direct evidence in determining sufficiency. See Holland v. United States, 348 U.S. 121, 140 (1954); United States v. Scruggs, 549 F.2d 1097, 1104 (6th Cir.1976), cert. denied, 434 U.S. 824 (1977).
 
 
 16
 Palazzolo failed to move for a judgment of acquittal on Counts 3, 5, 7, 8 or 10, those counts relating to events occurring before August 31, 1990 (see Trans.Vol. VII at 98-99, 106; Motion, Jt.App. at 218-21); therefore, the sufficiency of evidence on those ITAR counts is reviewed only for a "manifest miscarriage of justice." United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984); United States v. Moss, 9 F.3d 543, 551 (6th Cir.1993).
 
 
 17
 In order to convict the defendants for money laundering, the government was required to prove that they each: (1) conducted or attempted to conduct a financial transaction; (2) involving property represented by a law enforcement agent to be the proceeds of a specified unlawful activity (drug trafficking); (3) with the intent to conceal or disguise the nature, location, source, ownership or control of the property; and (4) believed the property was the proceeds of drug trafficking. 18 U.S.C. Sec. 1956(a)(3)(B) (1988); United States v. Kaufmann, 985 F.2d 884, 892-93 (7th Cir.), cert. denied, 113 S.Ct. 2350 (1993); United States v. Castaneda-Cantu, 20 F.3d 1325, 1330 (5th Cir.1994). The ITAR charges required proof that the defendants, as either a principal or an aider and abettor, "travel[ed] in interstate or foreign commerce or use[d] the mail or any facility in interstate or foreign commerce" with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," specified in this case as a violation of 18 U.S.C. Sec. 1956(a)(3)(B). 18 U.S.C. Sec. 1952(a)(3) (1988 & Supp. V 1993). Thus, both the money laundering and ITAR charges required the government to prove the defendants believed Travanut's money was the proceeds of illegal narcotics activity. Both defendants challenge the sufficiency of the evidence concerning their belief in this regard.
 
 A.
 
 18
 Palazzolo contends that his money laundering and ITAR convictions must be reversed. He asserts that the only evidence introduced by the government to suggest he had any knowledge of Travanut's purported drug business prior to August 31, 1990, was Travanut's subjective interpretation of interactions between himself and Palazzolo, supposedly proving a mutual understanding that the money was the proceeds of drug sales. And although Palazzolo was specifically told that Travanut was a heroin dealer at the August 31, 1990 meeting, he points out that he immediately told Travanut that he "want[ed] nothin' to do with it" and that Travanut thereafter was unable to prearrange another meeting with him.
 
 
 19
 The government need not show that the undercover agent made an express statement that the money to be laundered was the proceeds of drug activity, since " 'legitimate criminals,' whom undercover agents must imitate, undoubtedly would not make such recitations before each transaction." United States v. Arditti, 955 F.2d 331, 339 (5th Cir.), cert. denied, 113 S.Ct. 597 (1992). The government must only prove that the undercover agent made the defendant aware of circumstances from which a reasonable person would infer that the money was proceeds from drug trafficking. Kaufmann, 985 F.2d at 893; Castaneda, 20 F.3d at 1331; United States v. Starke, 62 F.3d 1374, 1382 (11th Cir.1995). In evaluating representations made by undercover agents, it should be noted that language which appears "ambiguous to a person unfamiliar with illicit activity may not be ambiguous to a person involved in an illicit activity." Castaneda, 20 F.3d at 1331 (citing United States v. Breque, 964 F.2d 381, 387 (5th Cir.1992), cert. denied, 113 S.Ct. 1253 (1993)).
 
 
 20
 Travanut testified that he alluded to his purported drug business during several conversations with Palazzolo over the course of the undercover operation. Travanut testified that while talking with Palazzolo on April 4, 1990, he momentarily confused Palazzolo by denying that he was in the "clothing business," which, as was explained to the jury, was a reference to drug trafficking in Hong Kong. (Trans.Vol. IV at 43-44) Immediately thereafter, however, Travanut told Palazzolo that he was in the business of "feeding the Canadian appetite," and Palazzolo nodded in return. (Trans.Vol. II at 48-49; Trans.Vol. IV at 44-45) The jury heard a taped conversation between Travanut, Palazzolo and Viviano in which Travanut assured Palazzolo that "the money's dirty," but not counterfeit. (Tape 2A at 2) Travanut also explained to the jury that he was referring to the drug trade when he told Palazzolo that he was "always in the market for buying and selling and ... puttin [sic] buyers and sellers together...." (Tape 3A at 17; Trans.Vol. II at 140-41) Thus, although the evidence did not show that Travanut explicitly used the word "drugs" in the presence of Palazzolo prior to August 31, 1990, a rational jury could have believed that Travanut effectively portrayed, and Palazzolo understood, that the funds they were laundering were the proceeds of illegal drug trafficking.
 
 
 21
 Furthermore, the most damaging evidence against Palazzolo is that he was unequivocally told that Travanut was in the heroin business on August 31, 1990, and yet continued his involvement in the cash-for-gold deals. A videotape of the August meeting was shown to the jury, containing the following conversation:
 
 
 22
 Palazzolo: What business are you talkin' about?
 
 
 23
 Travanut: We're talking about heroin.
 
 
 24
 Palazzolo: I want nothin' to do with it.
 
 
 25
 Travanut: That's good.
 
 
 26
 Palazzolo: (Unintelligible), I don't want anything to do with it.
 
 
 27
 Travanut: That's okay.
 
 
 28
 Palazzolo: Absolutely nothing.
 
 
 29
 (Tape 5A at 6) Despite his professed aversion to the drug business, Palazzolo continued to talk to Travanut and simply steered the discussion of the meeting back to the cash-for-gold plan. (Tape 5A at 7, see Trans.Vol. IV at 88) Palazzolo had previously mentioned that he was concerned about being watched by police because he was on parole (Trans.Vol. II at 39; Trans.Vol. III at 10-11), but had agreed to proceed with the laundering plan because he would be able to limit his involvement if his brother helped out. (Trans.Vol. III at 12-13; Trans.Vol. V at 132) Palazzolo appeared "uncomfortable" at the August 31, 1990 meeting, according to Travanut, because of possible surveillance by police, and Viviano reported afterwards that Palazzolo wished to reduce the number of times he met with Travanut so as not to arouse police suspicions. (Trans.Vol. III at 34-35, 58) At Travanut's final encounter with Palazzolo on December 12, 1990, Palazzolo indicated that Travanut should communicate with him through Viviano as an intermediary. (Trans.Vol. V at 71) Finally, despite Palazzolo's apparent desire to distance himself from Travanut, each time Travanut gave a bag of cash to Viviano for delivery to Rosenbaum's store, Palazzolo was seen thereafter meeting with his brother and Viviano. (Trans.Vol. V at 192, 215) In light of this evidence, the jury could have concluded that Palazzolo decreased his active involvement in the deals and meetings after August 31, 1990, not in an attempt to withdraw from a money laundering plan with a purported drug dealer, but simply because of his concern about police surveillance. Accordingly, no manifest miscarriage of justice resulted from the conviction of Palazzolo on Counts 3, 5, 7, 8 and 10. We conclude that sufficient evidence exists in the record to support all of Palazzolo's money laundering and ITAR convictions, and they will be affirmed.
 
 B.
 
 30
 In contrast, there was no evidence that Rosenbaum was told, much less believed, that the money he received for the purchase of gold was drug money. At Rosenbaum's sentencing, in fact, government counsel admitted that he could not point to anything in the record that would suggest Rosenbaum knew he dealt with drug proceeds. (Sentencing Trans. at 8) Travanut never met or spoke to Rosenbaum, so he never made Rosenbaum aware of his purported drug connection. Viviano's knowledge of the nature of Travanut's illegal business cannot be imputed to Rosenbaum simply from the fact that Rosenbaum was observed apparently dealing with Viviano and Salvatore Palazzolo (Trans.Vol. V at 210-11; Trans.Vol. VI at 23) or shown to have conducted a transaction with them (Trans.Vol. V at 216; Trans.Vol. VI at 31, 45, 85-86). See United States v. McDougald, 990 F.2d 259, 262 (6th Cir.1993) (guilt by association not condoned). Salvatore Palazzolo was the only person who had contact with Rosenbaum during the transactions who also testified at trial, and his testimony does not shed light on whether Rosenbaum might have known that the money was drug proceeds. (Trans.Vol. VII at 181-226) Nevertheless, the government claims the jury could have inferred that Rosenbaum learned of the illicit source of the money through his co-conspirators because there was evidence that (1) Viviano had received substantial point money on behalf of Rosenbaum (Trans.Vol. III at 84, 86-87, 112-13); (2) Viviano said the gold dealer knew the money was not "clean" (Trans.Vol. III at 122-23; Trans.Vol. V at 132); (3) Rosenbaum handled the money in a suspicious manner (Trans.Vol. VI at 107-08, 110, 114-15; Trans.Vol. VII at 33-34, 46); and (4) Rosenbaum lied to IRS agent Sanford Simons when he said he had never sold gold coins to a customer for over $10,000. (Trans.Vol. VII at 26).
 
 
 31
 However, these facts, even when viewed in a light most favorable to the government, do not support the inference that Rosenbaum in fact believed that the money was derived from the unlawful activity specified in this case, drug trafficking. The fact that Rosenbaum charged a high fee for the transactions, that Viviano said Rosenbaum knew the money was dirty, that Rosenbaum structured his deposits in order to avoid triggering the bank's reporting requirements and kept no record of the receipts suggest only that Rosenbaum may have been aware that he was handling tainted money, but not necessarily money tainted by drugs. See McDougald, 990 F.2d at 262 (unusual circumstances surrounding the purchase of a car did not prove defendant had knowledge that funds were drug money).
 
 
 32
 Nor can false exculpatory statements after the illegal transaction provide evidence of criminal knowledge, because they do not tend to establish guilty knowledge at the time of the transaction itself. Id. at 262-63. During a search of Rosenbaum's store executed by agents of the IRS Criminal Investigation Division in December of 1991 pursuant to a search warrant, Rosenbaum told IRS agent Simons that he had never engaged in a transaction in excess of $10,000 for the sale of gold coins and that he had not been involved in any large-scale cash transactions in 1990 or 1991. (Trans.Vol. VII at 26, 32) The government relies on these false statements as evidence of Rosenbaum's consciousness of guilt, but these denials can hardly be said to prove awareness that the money was the proceeds of drug trafficking. Moreover, the statements were made after Rosenbaum was put on notice that he was under some kind of criminal investigation and are irrelevant to Rosenbaum's state of mind at the time he entered into the two transactions with Viviano. McDougald, 990 F.2d at 263. The evidence supports an inference that Rosenbaum knew the money came from some illegal source, but this is not sufficient. The government must prove that the defendant knew it came from the illegal activity specified in the indictment--in this case, from drug trafficking. Because we conclude that there was insufficient evidence to support Rosenbaum's ITAR convictions, they must be reversed.
 
 IV.
 
 33
 Persons who "willfully" fail to file tax returns required by Title 26 of the United States Code are subject to criminal sanctions. 26 U.S.C. Sec. 7203 (1988 & Supp. V 1993). Wilfulness under 26 U.S.C. Sec. 7203 has been defined as a voluntary, intentional violation of a known legal duty. United States v. Pomponio, 429 U.S. 10, 12-13 (1976); Cheek v. United States, 498 U.S. 192, 200-01 (1991); United States v. Grumka, 728 F.2d 794, 797 (6th Cir.1984). Persons engaged in a trade or business who, in the course of that trade or business, receive more than $10,000 in cash from one transaction are obligated under 26 U.S.C. Sec. 6050I to file an IRS Form 8300. 26 U.S.C. Sec. 6050I(a) (1988). Furthermore, a person who causes a trade or business to fail to file a Form 8300 is subject to the same penalties applicable to a person who actually fails to file the form. 26 U.S.C. Sec. 6050I(f) (1988). Both defendants challenge the sufficiency of the evidence concerning their knowledge of the duty imposed by 26 U.S.C. Sec. 6050I.
 
 A.
 
 34
 Here, Travanut made explicit to Viviano that he did not want to leave a paper trail by reporting any of the transactions to the government. (Trans.Vol. II at 91; Trans.Vol. III at 74; Tape 8A at 3) On May 29, 1990, Palazzolo indicated that he too understood Travanut's concern about reporting when the following conversation occurred:
 
 
 35
 Travanut: Ah ... You don't have to worry about the banks or anything, ay?
 
 
 36
 Palazzolo: No.
 
 
 37
 Travanut: It's not going to any banks?
 
 
 38
 Palazzolo: No.
 
 
 39
 (Tape 1A at 3) Later, Palazzolo explained to Travanut that the benefit of the cash-for-gold deal is that "ya don have ta [sic] register or nothin [sic]," and "get all ya want you don hafta [sic] register...." (Tape 3A at 18; Trans.Vol. II at 142; Trans.Vol. III at 15) Palazzolo complains that these statements about banks and registering are insufficient because they do not relate to Rosenbaum's specific filing duty for transactions in excess of $10,000. Given the number of times reporting requirements were discussed, however, a jury could reasonably infer that Palazzolo would have learned about the Form 8300 requirements during the course of his preparation for the transactions.
 
 B.
 
 40
 As to Rosenbaum, a reasonable jury could also have found that he in fact knew of the duty to file Form 8300s even though there was conflicting evidence presented at the trial. IRS agent Christopher Lezovich testified that the IRS began a campaign to clarify any confusion Detroit business owners may have had concerning the Form 8300 in 1992, and that the IRS did not communicate specifically with Rosenbaum until February of 1992. (Trans.Vol. VII at 118-20 [note page numbering mistake in transcript] On the other hand, IRS agent Robert Gardner testified that the IRS attempted to inform all businesses regarding their obligation to file Form 8300s when the forms were first instituted in the mid-1980s. (Trans.Vol. VII at 8, 11-12) Direct examination of wholesale coin dealer John Engle revealed that he was aware of the Form 8300 reporting requirements at least in 1990, if not earlier. (Trans.Vol. VI at 96) Finally, IRS agent Simons told the jury that during an interview in 1991, Rosenbaum himself admitted he had shown the Form 8300 to his customers since the mid-1980s whenever they had over $10,000 in cash, but said that none of his customers had ever completed such a transaction. (Trans.Vol. VII at 24-26) Based on this evidence, a jury could reasonably conclude that Rosenbaum knew of the duty. The credibility of the testimony offered was exclusively for the jurors to determine; attacks on credibility concern only the quality, not the sufficiency of the evidence. United States v. Lindo, 18 F.3d 353, 357 (6th Cir.1994) (citations omitted).
 
 
 41
 Accordingly, we will affirm the defendants' convictions under 26 U.S.C. Secs. 6050I and 7203.
 
 V.
 
 42
 Both defendants contend that certain remarks by the prosecutor constituted prosecutorial misconduct that requires reversal. Counsel for both defendants moved for a mistrial based on statements in the prosecutor's closing argument. The district court denied their motions, stating that its curative instructions given at the time of the remarks and to be given in the court's charge would cure the effect of any improper argument.
 
 
 43
 On appeal, the defendants argue that the district court abused its discretion in failing to declare a mistrial based on the prosecutor's arguments. The defendants interposed contemporaneous objections to some of the remarks, but failed to object to others. We review those alleged improprieties that passed without objection for plain error under FED.R.CRIM.P. 52(b). United States v. Young, 470 U.S. 1, 15-16 (1985).
 
 
 44
 This court recently reviewed a number of our decisions involving claims of prosecutorial misconduct in United States v. Carroll, 26 F.3d 1380 (6th Cir.1994). In setting forth the standard for determining whether a prosecutor's improper remarks constitute reversible error, we first noted that "[t]he plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." Id. at 1383 (citations and internal quotation marks omitted). While some of the remarks cited by the defendants, but not objected to at trial, were improper, they do not satisfy the "exceptional circumstances" test. They clearly did not create "circumstances in which a miscarriage of justice would otherwise result" from failure to reverse a conviction. Young, 470 U.S. at 15 (quoting United States v. Frady, 456 U.S. 152, 163 n. 14 (1982)).
 
 
 45
 The step-by-step procedure outlined in Carroll for the prosecutor's comments to which an objection was made is as follows. The court first determines whether the prosecutor's remarks, in whole or in part, were improper. Any improper remarks are then examined to determine whether they were sufficiently flagrant under United States v. Leon, 534 F.2d 667 (6th Cir.1976), to warrant reversal. Carroll, 26 F.3d at 1384-86. This court will only reverse non-flagrant remarks when the proof against the defendant was not overwhelming, opposing counsel objected to the remark, and, following the objection, the district court failed to provide a curative instruction to the jury. Id. (clarifying United States v. Bess, 593 F.2d 749 (6th Cir.1979)); see also United States v. Brown, 66 F.3d 124 (6th Cir.1995) (citing Carroll, 26 F.3d at 1385 n. 6).
 
 
 46
 Applying these standards, we conclude that some of the prosecutor's comments, particularly those involving weapons made after the district court had excluded evidence of weapons in response to a motion in limine, were improper. Again, applying Carroll, we conclude that these instances of impropriety were not flagrant. See Carroll, 26 F.3d at 1385-86 (citing United States v. Leon, 534 F.2d 667, 678-83 (6th Cir.1976)). The improper remarks in the present case were not pervasive throughout the proceedings, but were confined to closing argument, and were unlikely to mislead the jury. The government's evidence with respect to the convictions we affirm was strong. In addition, most of the remarks appear to reflect comments in the heat of a hard-fought case rather than a deliberate attempt to prejudice the defendants unfairly.
 
 
 47
 Inasmuch as there was no contemporaneous objection to several of the comments and because the district court did admonish the jury with respect to those comments that were objected to, we conclude that the non-flagrant comments do not warrant reversal. Carroll, 26 F.3d at 1384-85, 1390 (listing conditions as described in United States v. Bess, 593 F.2d 749, 753-57 (6th Cir.1979), under which this court can reverse for non-flagrant comments of the prosecution).
 
 VI.
 
 48
 Because we reversed both defendants' conspiracy convictions in the accompanying opinion and Rosenbaum's conviction for interstate travel in aid of money laundering in this opinion, we vacate their sentences. Nevertheless, we consider Rosenbaum's appeal from his sentence for the district court's failure to grant a downward adjustment for acceptance of responsibility, his physical condition, his alleged ignorance of the duty to file Form 8300, and his role in the criminal activity.
 
 
 49
 Section 3E1.1(a) of the Sentencing Guidelines allows a two-point reduction in offense level when a defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. Sec. 3E1.1(a). A defendant who seeks a sentence reduction under the Guidelines bears the burden to prove by a preponderance of the evidence facts sufficient to justify a reduction. United States v. Rodriguez, 896 F.2d 1031, 1032-33 (6th Cir.1990). The determination of whether a defendant has accepted responsibility is a factual question that this court will review for clear error. United States v. Milligan, 17 F.3d 177, 185 (6th Cir.) (citations omitted), cert. denied, 115 S.Ct. 211 (1994). A careful review of Rosenbaum's sentencing hearing discloses that the district court's findings on which it based denial of the motion for an acceptance of responsibility reduction are not clearly erroneous.
 
 
 50
 Rosenbaum also argues that the district court should have departed from the Guidelines and granted a downward adjustment of his sentence on the basis of his poor physical condition as well as his ignorance of the requirements for filing Form 8300s. Failure to depart is not cognizable on appeal if "(1) the district court properly computed the guideline range, (2) the district court was not unaware of its discretion to depart downward from the guideline range, and (3) the district court did not impose the sentence in violation of law or as a result of the incorrect application of the Sentencing Guidelines." United States v. Meyers, 952 F.2d 914, 920 (6th Cir.1992) (citing United States v. Davis, 919 F.2d 1181, 1187 (6th Cir.1990)), cert. denied, 503 U.S. 994 (1992). The record discloses that the district judge was familiar with his discretion respecting downward departures and concluded the facts did not justify a departure in this case. The sentence was not imposed in violation of law or as a result of an incorrect application of the Guidelines. The denial of Rosenbaum's motion for downward departure does not raise an appealable issue.
 
 
 51
 Palazzolo's convictions on the all substantive charges are AFFIRMED; Rosenbaum's convictions for failing to file Form 8300s are AFFIRMED, and his convictions on the ITAR counts are REVERSED. The case is remanded to the district court for proceedings consistent with this opinion, and for resentencing.
 
 
 52
 RYAN, Circuit Judge, dissenting in part.
 
 
 53
 In my judgment, there is insufficient evidence to support the conviction of defendant Palazzolo on two counts of failing to file an IRS Form 8300, and aiding and abetting thereof, in violation of 26 U.S.C. Secs. 6050I & 7203, and 18 U.S.C. Sec. 2. Consequently, I respectfully dissent from part IV-A of the majority opinion. With respect to the remainder of the majority opinion, however, I am in full agreement.
 
 
 54
 Under 26 U.S.C. Sec. 6050I, "[a]ny person ... who is engaged in a trade or business, and ... who, in the course of such trade or business, receives more than $10,000 in cash," must file a currency transaction return called Form 8300. 26 U.S.C. Sec. 6050I(a) & (b). The statute also prohibits any person from causing a trade or business to fail to file a Form 8300 for the purpose of avoiding reporting requirements. 26 U.S.C. 6050I(f). Section 7203 of Title 26 provides that the penalty for a willful violation of section 6050I is a fine of up to $25,000 and imprisonment of up to five years.
 
 
 55
 As the statutes make clear, and as is well-settled in the case law, "willfulness" is an essential element of the crime of failing to file, United States v. Sempos, 772 F.2d 1, 1 (1st Cir.1985), making it a specific intent crime, United States v. Birkenstock, 823 F.2d 1026 (7th Cir.1987). Thus, the government must show that a defendant voluntarily and intentionally violated a "known legal duty," that is, that the defendant knew of the existence of the particular form to be filed, and intentionally failed to file it, or caused a business to fail to file it. Sempos, 772 F.2d at 2. A good faith belief that one was not required to file a return, or a lack of knowledge of such a requirement, negates willfulness. United States v. Gleason, 726 F.2d 385, 387 (8th Cir.1984). Moreover, "specific criminal intent is an element of the offense of aiding and abetting," and so, in order to aid and abet a failure-to-file violation, a defendant must have knowledge that Form 8300 existed. See United States v. Hill, 55 F.3d 1197, 1201-03 (6th Cir.1995).
 
 
 56
 While the majority opinion does not appear to take issue with the proposition that there can be no violation in the absence of willfulness, it has concluded, as the government has argued, that because there was abundant evidence that Palazzolo knew the entire purpose of Travanut's transactions was to avoid reporting requirements, it is fair to infer that Palazzolo learned about Form 8300 during the course of the conspiracy. Such an inference, however, is entirely without evidentiary support. The only evidence of Palazzolo's knowledge of any reporting requirements, as demonstrated by the testimony quoted in the majority opinion, is with respect to banks. Knowing that banks are required to file certain currency transaction returns is obviously not the equivalent of knowing of the entirely different transaction return at issue here. There is simply no evidence that Palazzolo had any idea that Rosenbaum, like a bank, also had reporting requirements; for example, in all the recorded discussions in which the cash-for-gold scheme was discussed, Palazzolo never suggested to Travanut that he could induce Rosenbaum to ignore any reporting requirements, and never mentioned a plan for evading any necessary filings. His silence in this regard strongly indicates that he was ignorant of any such requirements; he repeatedly boasted of his ability to evade bank reporting requirements. And while there is evidence that Rosenbaum knew of the Form 8300 requirement, there is no evidence that Rosenbaum mentioned the requirement to Palazzolo, or even to Viviano. And the majority does not even claim that the evidence fairly suggests such evidence; it only concludes that a conversation between the codefendants about Form 8300 could have occurred. Certainly, anything is possible, but speculative possibility is not sufficient to support a criminal conviction.
 
 
 57
 I would reverse Palazzolo's convictions on the failure-to-file counts.